**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Dated: January 11 2019

John P. Gustafson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 16-40675 |
| | ) | |
| Allied Consolidated Industries, Inc., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | Judge John. P. Gustafson |

### MEMORANDUM OPINION AND ORDER REGARDING TRUSTEE'S MOTION FOR PLAN CLARIFICATION

This cause comes before the court on Trustee John Lane's ("Trustee") Motion for Clarification of Plan Provision and Rights of Creditor Trustee. [Doc. #593]. Creditor United States Steel Corporation ("U.S. Steel") filed a Response in Support of Trustee's Motion [Doc. #600], and Reorganized Debtor Allied Consolidated Industries, Inc. ("Debtor" or "Reorganized Debtor") filed its own Response to the Trustee's Motion. [Doc. #601]. In his Motion, the Trustee seeks clarification regarding whether the Confirmed Plan of Reorganization ("Confirmed Plan") [Doc. #356] provided for the transfer of various rail rights to the Creditor Trust with the real property or, instead, that those rights are controlled by the Reorganized Debtor as part of the "Litigation Claims". [*Id.*].

The court has jurisdiction over the underlying Chapter 11[1] case pursuant to 28 U.S.C. §§1334, 157(a), and Local General Order 2012–7 of the United States District Court for the Northern District of Ohio. The Order Confirming Second Amended Joint Plan of Reorganization, as Modified, specifically provides that the bankruptcy court "shall retain jurisdiction over all matters arising from, or related to, this case and the Plan. . . ." [Doc. #378, p. 16]. Actions to clarify language in a confirmed plan are generally[2] core proceedings that this court may hear and determine. 28 U.S.C. §157(b)(1) and (b)(2)(A), (L) and (O). *See*, *In re Craig County Hospital Authority*, 572 B.R. 340, 343 (Bankr. N.D. Okla. 2017); *L.L. Murphrey Co. v. D.A.N. Joint Venture II, L.P. (In re L.L. Murphrey Co.)*, 2012 WL 1655761 at *2, 2012 Bankr. LEXIS 2110 at **7-8 (Bankr. E.D.N.C. May 10, 2012). Further, the Sixth Circuit has held: "a confirmed plan is considered to be an order of the bankruptcy court; the bankruptcy court has the power to interpret such a plan." *In re Conco, Inc.*, 855 F.3d 703, 711 (6th Cir. 2017)(citations omitted); *In re Terex Corp.*, 984 F.2d 170, 172 (6th Cir. 1993); *In re Dow Corning, Corp.*, 456 F.3d 668, 675-76 (6th Cir. 2006); *and see generally*, *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151, 129 S.Ct. 2195, 2205, 174 L.Ed.2d 99 (2009)("Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders.").

Because the plain language of the Confirmed Plan unambiguously provides that all assets of the debtor, save for certain litigation claims, became property of the Creditor Trust as of the effective date of the Confirmed Plan, the court finds that the rail rights at issue are property of the Creditor Trust, not the Reorganized Debtor.

### Factual Background

On April 13, 2016, Debtor Allied Consolidated Industries, Inc. and a number of its subsidiaries filed for Chapter 11 bankruptcy relief. Debtor filed a Motion to substantively consolidate the cases [Doc. #87]. The bankruptcy court granted that Motion on July 11, 2016. [Doc. ##122, 123]. Debtor filed a Second Amended Joint Plan of Reorganization[3] on May 2,

---

1/ The court notes that this Chapter 11 case was transferred to the undersigned judge effective July 7, 2018. *See*, [Doc. #546]; *see also*, Bankr. N.D. Ohio Administrative Order 18-03, ASSIGNMENT OF CASES FILED IN YOUNGSTOWN, https://www.ohnb.uscourts.gov/news/assignment-cases-filed-youngstown-effective-july-7-2018.

2/ There are reported decisions where the parties to a state law tort action unsuccessfully attempted to use the argument that "Plan interpretation" was one of the issues in the case. *See e.g.*, *Kmart Creditor Trust v. Conaway (In re Kmart Corp.)*, 307 B.R. 586, 594-596 (Bankr. E.D. Mich. 2004).

3/ Where possible, this opinion will utilize the same terminology, including capitalized terms, as found in the Confirmed Plan. [Doc. #356]. It should be noted that both the Second Amended Joint Plan of Reorganization and

2

16-40675-jpg    Doc 611    FILED 01/11/19    ENTERED 01/11/19 16:57:01    Page 2 of 10

2017. [Doc. #356]. The court entered an Order Confirming Second Amended Joint Plan of Reorganization on June 19, 2017. [Doc. #378]. Relevant here, the Confirmed Plan provided for the creation of a Creditor Trust tasked with implementing the terms of the Plan for the benefit of creditors. [Doc. #356, p. 16].

Trustee filed his Motion for Clarification of Plan Provision and Rights of Creditor Trustee on November 12, 2018, arguing that clarification was needed so that he could be certain that various rail rights associated with the estate are property of the Creditor Trust. [Doc. #593]. Trustee asserts that clarification is needed in order for the Creditor Trust to negotiate for the sale of railway-affected property. [*Id.*]. His position is that the rail rights should be regarded as assets of the Creditor Trust, pursuant to the Confirmed Plan. [*Id.*, p. 3]. This issue arises in the context of the negotiation of a sale of a parcel of land that the Creditor Trust has called the "Brown Beaver Parcel", which has been represented to be "under contract". [Doc. #593, p. 2].

In its Response in Support of Trustee's Motion, U.S. Steel argues that the Confirmed Plan clearly states that the rail rights at issue are property of the Creditor Trust. [Doc. #600, pp. 3-7]. U.S. Steel further argues that Reorganized Debtor's attempt to claim ownership of the rail rights is part of a series of actions intended to interfere with the Creditor Trust's liquidation of assets pursuant to the Confirmed Plan. [*Id.*, pp. 7-10].

Reorganized Debtor filed its Response to Trustee's Motion, arguing that it believes it has "all right, title and interest in the rail rights and rail easement rights[4] pursuant to Article VI of the Confirmed Plan." [Doc. #601, p. 1]. Reorganized Debtor also requested a hearing so that it could present testimony from its principal in support of its position. The court set the matter for hearing on December 10, 2018. [Doc. #597].

At the December 10th hearing, the parties presented their evidence and arguments to the court, including testimony from John R. Ramun, the principal of the Reorganized Debtor. While counsel for the Reorganized Debtor argued that the purpose of the Confirmed Plan was, in part, to balance the interests of creditors and the continued operations[5] of Reorganized Debtor, the

---

the related Amended Second Disclosure Statement were filed on both May 1, 2017. [Docs. ##354, 355] and May 2, 2017. [Docs. ##356, 357]. The Order confirming is linked to the later filed documents, and this decision will cite to Doc. #356 and Doc. #357.

4/ Both these rights will be encompassed in the term "rail rights" as used in this decision.

5/ The Confirmed Plan does state: "The Plan contemplates and intends that AGI will be operated as a going concern." [Doc. #356, p. 19, n. 4].

3

16-40675-jpg    Doc 611    FILED 01/11/19    ENTERED 01/11/19 16:57:01    Page 3 of 10

testimony of John R. Ramun was focused primarily on the language of the Plan and Disclosure Statement[6], and not on why or how the retention of the rail rights would impact the Reorganized Debtor's post-confirmation operations. On cross-examination, when asked how the Trustee should go about marketing and selling the real estate without the rail rights, John R. Ramun essentially stated that the property should not be sold.[7]

## Law and Analysis

At issue in this case is interpretation of a confirmed Chapter 11 plan of reorganization. "In interpreting a confirmed plan, courts use contract principles, since the plan is effectively a new contract between the debtor and its creditors." *Conco*, 855 F.3d at 711 (quoting *Dow Corning*, 456 F.3d at 676); *see also*, *In re Beta Intern., Inc.*, 210 B.R. 279, 285 (Bankr. E.D. Mich. 1996)("Interpretation of a Chapter 11 plan is basically a matter of contractual interpretation.")(citation omitted); *see also*, 11 U.S.C. §1141(a). In applying those contract principles, federal courts look to state law, and because the Confirmed Plan expressly provides that "…the laws of the state of Ohio govern this Plan…" [Doc. #356, p. 22], the court finds that Ohio contract law governs this dispute. *See*, *Conco*, 855 F.3d at 711; *Dow Corning*, 456 F.3d at 676.

Federal courts applying state law must look to the "law of the state's highest court." *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995); *see also*, *Brown v. Cassens Transport Co.*, 546 F.3d 347, 363 (6th Cir. 2008); *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999). As the Supreme Court of Ohio has stated:

> When confronted with an issue of contract interpretation, [the court's] role is to give effect to the intent of the parties. We will examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract. In addition, [the court] will look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement. When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. As a matter of law,

---

6/ "[C]ourts will not admit parol testimony to construe an ambiguity forced into the contract to strain the apparently meaning of the language." *U.S. v. Ohio*, 787 F.3d 350, 354 (6th Cir. 2015)(quoting *Fireman's Fund Ins. Co. v. Mitchell–Peterson, Inc.*, 63 Ohio App.3d 319, 328, 578 N.E.2d 851, 856 (Ct.App. 12th Dist.1989)); *and see generally*, *Williams v. Spitzer Autoworld Canton, L.L.C.*, 122 Ohio St.3d 546, 549, 913 N.E.2d 410, 415 (Ohio 2009)("The principal purpose of the parol evidence rule is to protect the integrity of written contracts.").

7/ This would be contrary to one of the findings of Judge Kay Woods, in a decision issued after a hearing on objections to the proposed Second Amended Joint Plan of Reorganization: "Thus, the Joint Plan provides assurance that the real estate will be sold." *In re Allied Consolidated Ind., Inc.*, 569 B.R. 284, 290 (Bankr. N.D. Ohio 2017).

4

a contract is unambiguous if it can be given a definite legal meaning.

*Sunoco Inc. (R & M) v. Toledo Edison Co.*, 129 Ohio St.3d 397, 404, 953 N.E.2d 285, 292 (Ohio 2011)(quotation omitted); *see also, Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 219, 797 N.E.2d 1256, 1261 (Ohio 2003); *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273, 714 N.E.2d 898, 900-01 (Ohio 1999).

Here, the court finds that an application of Ohio's rules of contract interpretation to the Confirmed Plan weighs heavily in favor of the Trustee's argument that the rail rights at issue are property of the Creditor Trust. Section 8.2 of the Confirmed Plan expressly provides that "[t]he assets to be transferred to the Creditor Trust (the "Trust Assets") shall include all assets of the Debtor as of the Effective Date other than the Reorganized Debtor Assets…." [Doc. #356, p. 16]. Section 8.2 goes on to state that "In summary – upon confirmation the Creditor Trust assets shall receive all of the real and personal property of the Debtor, both tangible and intangible, except the Litigation Claims which shall remain with the Reorganized Debtor…." [*Id.*, p. 18]. Section 6.1 of the Confirmed Plan defines "Litigation Claims" as "…various claims for breaches of contract, covenants, good faith, fair dealing, consequential and business damage claims…" and provides a list of such claims, at least two of which relate to "disputes over the use of railroad easements." [*Id.*, pp. 13-14].

In applying Ohio's rules of contract interpretation, the court finds that the Confirmed Plan unambiguously states that all assets, other than the Litigation Claims, became property of the Creditor Trust as of the effective date of the Confirmed Plan. In other words, the court construes "all of the real and personal property of the Debtor, both tangible and intangible, except the Litigation Claims" [Doc. #356, p. 18] to mean what it says. The language describing the Creditor Trust Assets is broad, with the Confirmed Plan stating that Trust Assets "include without limitation the following:" [Doc. #356, p. 16]. The "300 Acres of Industrial Real Estate" is specifically included in the Trust Assets, with no stated limitation relating to rail rights. [Doc. #356, p. 18].

Moreover, Article VIII of the Confirmed Plan describes both the assets of the Creditor Trust and its duties, which include exercising "…dominion and control over all Trust Assets for the benefit of all Creditors who are beneficiaries of the Creditor Trust…" [Doc. #356, p. 18], and "…sell[ing], leas[ing], or transfer[ing] any Trust Assets or determin[ing] whether to invest Trust Assets to maximize the return to the Creditor Trust." [*Id.*, p. 19]. To regard the rail rights as property of the Reorganized Debtor contradicts the Confirmed Plan's delineation of the Creditor

16-40675-jpg    Doc 611    FILED 01/11/19    ENTERED 01/11/19 16:57:01    Page 5 of 10

Trust's assets and duties because the Creditor Trust would be unable to sell, lease, or transfer real property burdened with rail rights that belong to someone other than the Creditor Trust. A more reasonable interpretation is one that harmonizes asset ownership with the Creditor Trust's duties by following the plain language of the Confirmed Plan and holding that the rail rights are property of the Creditor Trust. Accordingly, the court finds that the rail rights at issue are property of the Creditor Trust because they are intangible assets that are not "various claims for breaches of contract, covenants, good faith, fair dealing, consequential and business damage claims." [*Id.*, pp. 5, 13-15]. In other words, the court finds that the Confirmed Plan purposefully differentiates between "assets" and "claims."

Though Reorganized Debtor argues that the term "Litigation Claims" encompasses rail rights because some of those claims relate to disputes over use of rail easements, the court finds this argument unpersuasive because it contradicts the ordinary meaning of the Confirmed Plan's language. *See*, *Toledo Edison Co.*, 129 Ohio St.3d at 404, 953 N.E.2d at 292 ("…[the court] will look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement.").

Had the parties intended for the term "Litigation Claims" to cover assets other than legal claims, such as rail rights, they could (and should) have included language to that effect in the Confirmed Plan. Instead, the parties memorialized their understanding of which assets became property of the Creditor Trust using broad, illustrative phrases like "all of the real and personal property of the Debtor, both tangible and intangible" [Doc. #356, p. 18], demonstrating that the parties intended that the Creditor Trust would exercise expansive control over a wide array of Debtor's property, including rail rights.

Ohio courts have also held that a writing, or writings executed as part of the same transaction, will be read as a whole, and the intent of each part will be gathered from a consideration of the whole. *See*, *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Authority*, 78 Ohio St.3d 353, 361-362, 678 N.E.2d 519, 526 (Ohio 1997)(citing cases); *see also*, *Bank of New York Mellon v. Rhiel*, ___ N.E.3d ___, ___ n.1, 2018 WL 6778145 at *2 n.1, 2018 Ohio LEXIS 3007 at *11 n.1 (Ohio 2018)("An understanding of the intent of each part of an agreement, including definitions of terms, must be ascertained through consideration of the agreement as a whole."). The only pre-confirmation assets of the Debtor that would be transferred to the Reorganized Debtor, per the exception, are the "Litigation Claims." *See,* [Doc. #356, pp. 5-

6

6, 18]. Viewing the Confirmed Plan as a whole,[8] the fact that the Confirmed Plan contains other specific exceptions to the broad transfer of property rights to the Creditor Trust shows that the drafting parties understood how to include and draft a clear exception.

The Confirmed Plan includes some clear and specific exceptions that stand in contrast to the lack of any clear statement regarding the alleged exclusion of railroad rights from Trust Assets. For example, the Confirmed Plan expressly separates the 300 acres of industrial real estate from the manufacturing facility. [Doc. #356, p. 18]. The Confirmed Plan also deals with the disputed Norfolk Southern easement, stating that: "Any AED affected real estate will be sold subject to the easement granted to Norfolk, reserving all rights to challenge the easement." [Doc. #356, pp. 6 & 17]. There is no similar statement regarding real estate being sold subject to the Reorganized Debtor's retained rail rights. Notably, the Confirmed Plan states that the "real property parcels to be sold are identified on Exhibit 'B'", which lists Mahoning County parcel numbers, with no indication that railroad rights are reserved. [Doc. #356, pp. 18 & 44].

Thus, the fact that the Confirmed Plan does not include a clear exception for rail rights weighs against Reorganized Debtor's argument that this court should read one into it. *See*, *Nationwide Ins. Cos.*, 86 Ohio St.3d at 273, 714 N.E.2d at 901 ("When the terms included in an existing contract are clear and unambiguous, [courts] cannot create a new contract by finding an intent not expressed in the clear and unambiguous language of the written contract."). Moreover, the concept of enforcing clear and unambiguous language should be scrupulously applied in interpreting the Confirmed Plan because it was subject to voting by creditors who were specifically instructed to "refer to ARTICLE II. Through ARTICLE VIII. below of this Plan for information regarding the precise treatment of their Claims and how this Plan will operate." [Doc. #356, p. 2].

While the plain meaning of the Confirmed Plan is the basis for this court's decision, there are several additional problems with the position of the Reorganized Debtor regarding the rail rights. First, there are liens in place – a security interest and mortgage in favor of the

---

8/ Because the court is able to resolve this issue of contract interpretation by relying solely on the unambiguous language of the Confirmed Plan, it need not, and arguably should not, look to any extrinsic documents. *See*, *Toledo Edison Co.*, 129 Ohio St.3d at 404, 953 N.E.2d at 292 ("When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties."). However, the court notes that plan confirmation orders have been held to be properly read as a component of a Chapter 11 Plan. *See*, *In re Dynegy*, 486 B.R. 585, 590 (Bankr. S.D.N.Y. 2013). The Order Confirming expressly provides that "'Litigation Claims' shall have the meaning set forth in Section 6.1 of the Plan," [Doc. #378, p. 9] and the Creditor Trust Agreement, which is attached as Exhibit A to the Confirmed Plan, reiterates that "…upon confirmation the Creditor Trust assets shall receive all of the real and personal property of the Debtor, both tangible and intangible, except the Litigation Claims…." [Doc. #356, p. 29].

"Professionals' Secured Claims" [Doc. #356, p. 8], a judgment lien in favor of U.S. Steel [Doc. #356, pp. 9 & 10], and a judgment lien in favor of Norfolk Southern Railway. [Doc. #356, p. 11]. It appears that these liens were already attached to the 300 Acres of Industrial Real Estate. [Doc. #356, p. 18]. The Confirmed Plan states: "The U.S. Steel Judgment Liens are on AED's real property located in Mahoning County, Ohio." [Doc. #356, p. 9]. No provision of the Confirmed Plan states how the rail rights, which presumably would be subject to these security interests, could be transferred to the Reorganized Debtor when the Creditor Trustee [Doc. #356, p. 4] is charged with paying U.S. Steel's secured claim from the proceeds of sale of the AED real estate. [Doc. #356, p. 10]. To the extent the Reorganized Debtor position may be that the lien of U.S. Steel was somehow being avoided as to the rail rights, there was no evidence presented as to where notice of that action was provided to the lien holder and other creditors.

In addition, the 300 Acres of Industrial Real Estate comes from two different entities – it is described as "real estate currently owned by the Debtor or AID. . . ." [Doc. #356, p. 18]. "AID" is described as "Allied Industrial Development Corporation, Inc., a non-debtor affiliate which is 100% owned by Debtor ACI and contributing all of its real estate in the approximate amount of 106 acres, to the Creditor Trust for Plan funding." [Doc. #356, p. 2]. Moreover, the stock of AID is also a Creditor Trust Asset. [Doc. #356, p. 18]. With the language of the Confirmed Plan transferring the 106 acres to the Creditor Trust, and the Creditor Trust receiving the corporate stock, there does not appear to be even a colorable argument that the rail rights associated with the 106 acres of AID real estate were not part of the assets transferred to the Creditor Trust.

Finally, if the rail rights were being transferred to the Reorganized Debtor, there should have been some discussion of the impact that transfer would have on the Best Interest of Creditors Test and feasibility.[9] *See*, §§1129(a)(7)(A)(ii); 1129(a)(11); *In re Allied Consolidated Ind., Inc.*, 569 B.R. 284 (Bankr. N.D. Ohio 2017). Clearly, in a Chapter 7 liquidation, the Chapter 7 trustee would sell the real estate free of any claim of any of the debtor entities. To the extent that the Confirmed Plan intended to transfer the rail rights to the Reorganized Debtor, the consequences of that transfer should have been included in the liquidation analysis, and in determining if the payment of creditor claims in full, with 6% interest, was feasible if the rail rights were excluded.

---

9/ The requirement imposed by § 1129(a)(11) is commonly known as the 'feasibility' test for confirmation. *See generally*, *In re Trenton Rodge Investors, LLC*, 461 B.R. 440, 478 (Bankr. S.D. Ohio 2011).

However, the Amended Second Disclosure Statement makes no specific mention of these issues in connection with the rail rights. [Docs. #357, p. 38; Doc #357-8, Ex. 8, p. 2].

In fact, the Amended Second Disclosure Statement does not include either any documents from the rail rights litigation, or even a detailed description of the issues or parcels involved in the litigation. [Doc. #357, pp. 7-8]. Other than docket numbers, there are no citations in the Amended Second Disclosure Statement to the underlying court decisions. Instead, there is a short descriptive paragraph [10] regarding the litigation in the Confirmed Plan, and two identical paragraphs (the shorter one being duplicative) in two place in the Amended Second Disclosure Statement. [Doc. #357, pp. 7-8, 26]. The Reorganized Debtor appears to rely on these nearly identical short descriptions of the litigation as having provided adequate notice to both creditors and the court of the exclusion of the rail rights from the assets transferred to the Creditor Trust. [Doc. #357, p. 26].

However, the decision of the Sixth Circuit Court of Appeals reflects that litigation in *Allied Erecting and Dismantling Co., Inc. v. Surface Transp. Bd.*, 835 F.3d 548 (6th Cir. 2016), *cert. denied*, 137 S.Ct. 1582 (2017) involved only "two parcels of land, one on each side of the Center Street Bridge in Youngstown, Ohio." One of the lots, on the west side of the Center Street Bridge, is "known as lot 62188". *Id*. at 551-552. In the Surface Transportation Board decision upheld by the Sixth Circuit, the issues involving this parcel are referred to as "The LTV Easement". *See*, *Allied Erecting and Dismantling, Inc. and Allied Industrial Dev. Corp. – Petition for Declaratory Order*, F.D. 35316, 2013 WL 6709740 at **1-3 (S.T.B. served December 20, 2013)("*Allied I*").[11]

---

10/ "AED and AID commenced suit against the Surface Transportation Board in the United States District Court, Northern District of Ohio, Case Nos. 14-CV-03094, 14-CV-04020, and 15-CV-4012 [sic]. These matters stemmed from disputes over the use of railroad easements. The judgment was appealed to the United States Court of Appeals for the Sixth Circuit. The Debtor is seeking non-monetary relief concerning property usage and rights. Oral arguments were held on June 8, 2016. The Court denied the Debtor's petition for review on August 22, 2016. The Debtor filed a petition for writ of certiorari with the United States Supreme Court Case No. 16-875. On April 17, 2017, the petition for writ of certiorari was denied." [Doc. #356, p. 14]. The Second Amended Disclosure Statement's paragraphs are identical, except that the second to last sentence reads: "The Debtor filed a petition for write of certiorari with the United States Supreme Court on December 23, 2016 and it was placed on the docket on January 11, 2017 as Supreme Court Case No. 16-875." [Doc. #357, pp. 7, 26]. The duplicate paragraphs in the Second Amended Disclosure Statement repeat the same description, but end with the sentence: "The Debtor is seeking non-monetary relief concerning property usage and rights." [Doc. #357, pp. 8, 26]. This stands in contrast to the Second Amended Disclosure Statement's much more detailed description of the prepetition U.S. Steel litigation. [Doc. #357, pp. 12-14].

11/ A petition to reopen this decision was denied. *See*, *Allied Erecting and Dismantling, Inc. and Allied Industrial Dev. Corp. – Petition for Declaratory Order*, F.D. 35316, 2015 WL 5459097 (S.T.B. served September 17, 2015)("*Allied II*"). Both the original S.T.B. decision, the decision on the petition to reopen, were part of the appeal to the Sixth Circuit Court of Appeals. *See*, *Allied v. S.T.B*., 835 F.3d 548.

One of the issues left to the state court is whether or not Allied Industrial Development Corp. owns "lot 62188". *Allied v. S.T.B.*, 835 F.3d at 553 ("But until the state court determines who owns lot 62188, there is nothing left for the Board or this court to decide.").

The second easement was described as "The P&LE Easement" in *Allied I*, at **3-4. This litigation dealt primarily with whether the entities referred to as "Ohio Central" could be prohibited from "stopping, staging, or storing cars on the lines." *Allied I*, at *11. The Surface Transportation Board specifically declined to rule on the issue of "whether Allied has the right under state law to operate on the tracks at issue in this case." *Allied I*, at *11. Regardless, the unresolved issues stemming from *Allied I* and the subsequent Sixth Circuit decision do not appear to implicate the plan interpretation issue before this court. Moreover, it is difficult to see how information gleaned from a close reading of the underlying cases could be adequate notice to the court, or to the creditors voting on the proposed Second Amended Joint Plan of Reorganization of the property rights the Reorganized Debtor has claimed. In a Chapter 11 case, that information is required to be in the disclosure statement and plan.

After hearing the evidence and testimony presented, it is not clear to this court whether "lot 62188" is one of the parcels of real estate listed in Exhibit B[12] to the Confirmed Plan. [Doc. #356, p. 44]. It is also unclear what parcel or parcels of property are subject to "The P&LE Easement." Nor is there clear evidence of the scope of the "rail rights" claimed by the Reorganized Debtor as being excepted from the transfer of all "real and personal property of the Debtor, both tangible and intangible" to the Creditor Trust.

In sum, the court finds that the Confirmed Plan unambiguously provides that the rail rights at issue in this matter are property of the Creditor Trust, and were not separated from the 300 Acres of Industrial Real Estate and transferred to the Reorganized Debtor by implication as part of the Litigation Claims. To hold otherwise would be to contradict the plain meaning of the language used on the Confirmed Plan.

**THEREFORE**, for the reasons stated above,

**IT IS ORDERED** that all rail rights were transferred with the "300 Acres of Industrial Real Estate", are part of the assets of the Creditor Trust, and may be sold with the real estate pursuant to the provisions for sale set forth in the Confirmed Plan.

**IT IS SO ORDERED.**

---

12/ No parcel number appears to match. [Doc. #356, p. 44, Ex. B].