**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



**Dated: April 22 2019**

John P. Gustafson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.  16-40675 |
| | ) | |
| Allied Consolidated Industries, Inc., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | Judge John. P. Gustafson |

## <u>MEMORANDUM OPINION AND ORDER REGARDING TRUSTEE'S AMENDED OBJECTION TO CLAIM NUMBER 8</u>

This case is before the court on Trustee John Lane's ("Trustee") Amended Objection to Claim Number 8 ("Objection"). [Doc. #474].   Claimant Ohio Department of Taxation ("ODT") filed a Response that incorporates its responses to Trustee's original Objection. [Doc. ##489, 262, 269].   After a trial on the Objection was held on September 24 and 25, 2018, Trustee and ODT filed post-trial briefs [Doc. ##587, 589], proposed findings of fact/conclusions of law [Doc. ##588, 590], and responses to each other's post-trial briefs. [Doc. ##591, 592].

In his Objection, the Trustee argued that the claim at issue, Claim Number 8, ("Claim") should be disallowed because Reorganized Debtor Allied Consolidated Industries, Inc.'s[1] ("ACI")

---

1/  Because ACI is the parent company of AED and Gator - the two ACI subsidiaries against which ODT assessed use tax - and because all of the parent company and subsidiary Chapter 11 cases were substantively consolidated [Doc. ##87, 101, 123], this opinion refers to all three entities interchangeably unless otherwise noted.

records indicate that no tax, interest, or penalties are due for the time period stated on ODT's Proof of Claim. [Doc. #474, p. 2]. In response, ODT argued that Trustee has not presented enough documentation to overcome the presumptive validity of a properly filed proof of claim for unpaid taxes. [Doc. #262, pp. 1-2; Doc. #269, p. 4].

The court has jurisdiction over the underlying Chapter 11 case[2] pursuant to 28 U.S.C. §§1334, 157(a), and Local General Order 2012–7 of the United States District Court for the Northern District of Ohio. Actions to determine the amount and validity of tax claims against the bankruptcy estate are core proceedings that this court may hear and determine. 28 U.S.C. §157(b)(1) and (b)(2)(A) & (B); 11 U.S.C. §505(a)(1); *see*, *Michigan Employment Security Commission v. Wolverine Radio Co., Inc.* (*In re Wolverine Radio Co.*), 930 F.2d 1132, 1138 (6th Cir. 1991); *City Vending of Muskogee v. Oklahoma Tax Comm'n*, 898 F.2d 122 (10th Cir. 1990)(holding that federal courts have jurisdiction over tax claims under §505 where the debtor has either not challenged the tax assessment prior to bankruptcy or a challenge remains pending at the time of filing).

Because the Trustee has carried his burden and presented sufficient evidence[3] indicating that some of AED/Gator's use tax assessed equipment and expenses are exempt under Ohio law, the court will allow Claim Number 8 in part, and disallow Claim Number 8 in part.

### Factual Background[4]

On April 13, 2016, ACI and a number of its subsidiaries filed for Chapter 11 bankruptcy relief. ACI filed a Motion to substantively consolidate the cases [Doc. #87], which the court granted on July 11, 2016. [Doc. #123]. ACI filed a Second Amended Joint Plan of Reorganization on May 2, 2017. [Doc. #356]. The court entered an Order Confirming Second Amended Joint Plan of Reorganization on June 19, 2017. [Doc. #378]. The Confirmed Plan provided for the

---

2/ The court notes that this Chapter 11 case was transferred to the undersigned judge effective July 7, 2018. *See*, [Doc. #546]; *see also*, Bankr. N.D. Ohio Administrative Order 18-03, ASSIGNMENT OF CASES FILED IN YOUNGSTOWN, https://www.ohnb.uscourts.gov/news/assignment-cases-filed-youngstown-effective-july-7-2018.

3/ Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the witnesses, considered all of the evidence, and reviewed the entire record of the case.

4/ The facts are taken from the parties' Joint Stipulations and Exhibits [Doc. #561], proposed Findings of Fact [Doc. ##588, 590], the two trial transcripts [Doc. ##582, 583], the exhibits admitted at trial, and the court's review of this case's docket. For ease of reference, the court will cite to these sources using docket numbers.

2

creation of a Creditor Trust, represented by the Trustee, tasked with implementing the terms of the Plan for the benefit of creditors. [Doc. #356, p. 16].

The tax issue before the court implicates only two of ACI's subsidiaries,[5] Allied Erecting and Dismantling Co., Inc. ("AED") and Allied Gator, Inc. ("Gator"). AED is an Ohio corporation in the business of dismantling industrial structures and recycling the resulting base materials. [Doc. #561-2, p. 2]. AED's recycling of materials is referred to more simply as "scrap work." [Doc. #582, p. 17]. Gator manufactures hydraulic equipment attachments that facilitate the dismantling of materials. [Doc. #582, p. 27].

On July 28, 2016, ODT filed Claim No. 8 in AED's then stand-alone Chapter 11 case, Case No. 16-40672.[6] The Claim states that AED owes the state of Ohio $993,950.58, with $881,918.75 constituting priority tax debt. [Claim No. 8-1, p. 3]. ODT's claim is based upon its assessment, No. 400000464958, issued on September 29, 2016 after ODT conducted a field audit at AED's Youngstown facility with an audit period between January 1, 2009 and September 30, 2015 (the "Audit Period"). [Doc. # 561, p. 2; Doc. #582, p. 224].

On December 30, 2016, AED filed its original Objection to ODT's claim [Doc. #226] and after confirmation of the Second Amended Joint Plan on June 19, 2017, the Trustee, as representative of the Creditor Trust, was substituted for AED as the real party in interest under Section 8.3(m) of the Plan. [Doc. #356, pp. 19, 37-38]. Although the Trustee initially pursued its claim objection via adversary proceeding [Adv. Pro. No. 17-04033], the court closed the adversary proceeding once the Trustee filed his Amended Objection, opting to pursue his objection to ODT's assessment via the claims objection process.

Because the Trustee and the Creditor Trust produced certain missing invoices in support of their Objection, ODT agreed to reduce its tax claim to $861,846.95 and it is that amount that has been put before this court for determination under §505(a). [Doc. #561, p. 2].

A.    Day One of the Trial on the Trustee's Objection

On September 24th, 2018, the court held day one of the trial on the Trustee's Objection. Counsel for the Trustee gave his opening statement, describing the nature of the AED and Gator

---

5/  Based on the evidence presented and the parties' briefing, it does not appear that Allied Industrial Scrap., Inc., another of ACI's subsidiaries involved in the underlying substantively consolidated Chapter 11 case, is affected by the Trustee's Objection.

6/  The parties agree that ODT's Claim is good against the substantively consolidated estate. [Doc. #588, p. 2].

3

businesses and the applicability of Ohio's Manufacturing Exemption ("Manufacturing Exemption") to some of the items on which ODT's assessment was based. [Doc. #582, pp. 4-7]. Trustee's counsel stated that AED and Gator had failed to remit use tax payments since the early 1970's, triggering ODT's audit. [*Id.*]. However, the audit was incomplete because of the unavailability of relevant financial documents due to AED and Gator's financial disarray. [*Id.*, pp. 5-6]. Because the Trustee had employed an expert and assembled many of the documents that were missing during the audit, counsel for Trustee argued that ODT's claim should be lowered to around $130,000.00, plus penalties and interest. [*Id.*, p. 6].

In his opening statement, counsel for ODT emphasized that the burden of proof lies on the Trustee in tax proceedings under Ohio law. [*Id.*, p. 8]. He laid out ODT's case in two parts, with the first focusing on the specifics of what occurred during the audit underlying ODT's assessment, and the second dealing with the nature of AED's business and how Ohio's Manufacturing Exemption does not apply to AED/Gator's operations. [*Id.*, p. 9]. Highlighting the legal effect of tax audits, counsel for ODT argued that the court should not second guess the audit or otherwise allow AED to redo what has already been done. [*Id.*, pp. 10-11].

### A-I.    J.P. Ramun's Testimony

After opening statements ended and the court granted ODT's oral motion seeking separation and exclusion of witnesses, the Trustee began his case by calling J.P. Ramun[7] ("Mr. Ramun"), representative of AED and Gator, to the stand. [*Id.*, p. 15]. Mr. Ramun stated that, as an assistant secretary and corporate officer of AED and Gator, he was a custodian of records for AED and could testify as to the authenticity of AED corporate documents. [*Id.*, pp. 16-17]. Though he was an operations manager at the time the audit was performed, Mr. Ramun stated that he was aware of the audit. [*Id.*, p. 17]. After having examined Exhibits A through Q, Mr. Ramun testified that those documents were regularly maintained AED records kept in the ordinary course of business. [*Id.*, pp. 17-18]. Mr. Ramun went on to explain that each document indicated who prepared it and at what stage in the process it was entered into AED's Solomon accounting software ("Solomon"). [*Id.*, pp. 17-19].

Counsel for the Trustee then directed Mr. Ramun's attention to Exhibit A-1, which Mr. Ramun identified as an invoice for Advanced Auto Glass, one of AED's vendors. [*Id.*, p. 19]. Mr. Ramun explained that invoices like Exhibit A-1 were sent to AED's accounting department after

---

7/   Not to be confused with John R. Ramun, J.P. Ramun's father, who is also affiliated with ACI.

16-40675-jpg    Doc 639    FILED 04/22/19    ENTERED 04/22/19 16:18:51    Page 4 of 35

AED received services, and that these invoices contained information indicating who had handled the order, the account it concerned, which worksite the invoice related to, and the piece of AED/Gator equipment that was worked on, upgraded, or repaired. [*Id.*, pp. 19-21]. Mr. Ramun went on to identify Exhibits A-2 and A-3 as invoices similar to Exhibit A-1, noting that Exhibit A-3 concerned AED being invoiced for forklift glass work that would have been needed when a forklift's glass was scarred from scrapping work. [*Id.*, pp. 24-25].

Mr. Ramun then turned to Exhibit B-1 and identified it as an invoice for work performed to repair a cylinder on a 345 Caterpillar (also referred to as a "Cat") excavator, a piece of equipment that would carry Gator-made dismantling tools and perform scrapping work. [*Id.*, pp. 25-27]. Though Mr. Ramun identified Exhibits B-2 and B-3 as related to a bucket cylinder for a scrap loader, B-4 as related to a Cat forklift used in assembly, and B-6 as related to the same Cat 345 as B-1, Mr. Ramun could not be sure what B-5 related to, stating that more information could be found in accompanying work order 42040. [*Id.*, pp. 25-26]. Ultimately, Mr. Ramun identified all but one of the B Exhibits,[8] and identified which of them related to equipment used in Youngstown during the audit period. Of the 35 B Exhibits, Mr. Ramun identified Exhibits B-1 through B-4, B-6 through B-9, B-11 through B-26, B-28, and B-30 through B-33 as related to equipment used either in processing scrap or assembling/repairing Gator-made attachments, both of which occurred at the Youngstown site. [*Id.*, pp. 26-50].

Mr. Ramun drew the court's attention to unit number 05-107 on Exhibit B-8, noting that the number corresponded with an equipment list that provided details regarding the equipment at issue, including make, model, size, serial number, date of purchase, and the location of the equipment. [*Id.*]. Mr. Ramun explained that the equipment list and a daily reporting system,

---

8/ Mr. Ramun identified the B Exhibits as follows: B-1, Cat 345 [Doc. #582, p. 25]; B-2, bucket cylinder for a scrap loader [*Id.*, p. 26]; B-3, bucket cylinder for a scrap loader (same as B-2) [*Id.*]; B-4, Cat forklift used in assembly [*Id.*]; B-6, Cat 345 [*Id.*, pp. 26, 29 ]; B-7, forklift cylinder repair [*Id.*, p. 29]; B-8, cylinder repair on a Cat 308 excavator [*Id.*]; B-9, inspection of a Komatsu PC-1100 excavator [*Id.*, p. 38]; B-10, repair of an AED customer's cylinder [*Id.*, p. 39]; B-11, a boom cylinder for Unit 193 [*Id.*]; B-12, maintenance performed on a Cat excavator [*Id.*, p. 40]; B-13, repairs on a bucket cylinder on a Cat 308 mini-excavator [*Id.*]; B-14, boom cylinder repairs for a Cat 345 excavator [*Id.*]; B-15, repairs on a 950 claw bucket cylinder [*Id.*, pp. 40-41]; B-16, lift cylinder for a Cat 988-F [*Id.*, p. 41]; B-17, same as B-16 [*Id.*]; B-18, Cat 308 mini-excavator [*Id.*]; B-19, Cat V80 forklift repairs [*Id.*]; B-20, Cat V80 forklift; B-21, Komatsu 200 bucket cylinder [*Id.*, p. 44]; B-22, Cat 345 [*Id.*]; B-23, Cat 345 boom cylinder inspection [*Id.*].; B-24, Cat 345 [*Id.*, pp. 44-45]; B-25, Cat 345 repairs [*Id.*, p. 45]; B-26, excavator [*Id.*]; B-27, MT shear repairs [*Id.*, pp. 45-46]; B-28, forklift cylinder repairs [*Id.*, p. 46]; B-29, rock truck [*Id.*]; B-30, Hyster forklift [*Id.*, p. 47]; B-31, side shift cylinders on Big Red forklift [*Id.*]; B-32, Cat V80 forklift [*Id.*, p. 50]; B-33, Cat V80 forklift [*Id.*]; B-34, lull tilt cylinder [*Id.*]; and B-35, R35 rock truck dump cylinder [*Id.*]. The only B Exhibit Mr. Ramun was unable to identify was B-5. [*Id.*, p.26].

16-40675-jpg    Doc 639    FILED 04/22/19    ENTERED 04/22/19 16:18:51    Page 5 of 35

maintained through Solomon, tracked the location of all of AED's equipment. [*Id.*, pp 31-32]. Mr. Ramun identified Exhibit U as the equipment list in question and explained that the first column provides equipment category unit numbers, with 01 indicating trailers, 02 indicating tractors, trucks, and service vehicles, 03 indicating front-end loaders, 04 indicating cranes, 05 indicating excavators, 07 indicating earth-working equipment, 08 indicating personnel lifting equipment, and 09 indicating forklifts. [*Id.*, pp. 32-33]. Mr. Ramun stated that, with the aid of the Exhibit U equipment list, one could determine where each piece of AED's dismantling equipment was located during the audit period. [*Id.*, p. 35].

After being asked to describe the tools that Gator produced and how they relate to the scrapping work that was being done, Mr. Ramun explained that Gator manufactures shears and processors that break down scrap/concrete, cut steel, and break and process cast iron. [*Id.*, pp. 27-28]. Mr. Ramun further explained that Gator-made tools are custom fitted to the excavators and that all Gator-made tools used in Youngstown were used for scrap operations. [*Id.*, pp. 27-28, 54]. On cross-examination, Mr. Ramun gave examples of Gator-made attachments, including grapples, magnets, and shears. [*Id.*, pp. 118-19]. Mr. Ramun also later explained to the court that Gator tested and produced attachments both for use in AED's scrap processing and to be sold to third-party customers as upgrades to the customer's equipment. [*Id.*, p. 139].

Mr. Ramun testified that no dismantling work was done in Lorain during ODT's audit period. [*Id.*, pp. 27-28]. Instead, AED processed reject mill piping in Lorain. [*Id.*]. The rejected pipes were sheared, weighed, piled, stored, and loaded onto railroad cars to be sold. [*Id.*, pp. 28-29]. Mr. Ramun further stated that AED did not conduct any dismantling operations in Ohio during the audit period. [*Id.*, p. 30]. When asked to describe AED's dismantling operations, Mr. Ramun testified that AED performed dismantling work throughout the country and that it consisted of tearing down facilities, sorting the torn-down materials into groups of ferrous and non-ferrous metals, and then selling the sorted, broken-down metals, with ferrous metals being sold locally and non-ferrous metals sent back to Youngstown for processing before sale. [*Id.*, p. 92]. Mr. Ramun later explained to the court that whether AED was paid for its dismantling work in cash, or in the scrap produced, depended on the negotiated job contract. [*Id.*, p. 137].

The scrap that was sent to Youngstown, per Mr. Ramun's testimony, was initially off-loaded and organized into many different piles, with each pile consisting of various types of scrap, such as magnets, non-ferrous pipe, condensers, radiators, aluminum, and copper wires. [*Id.*, p. 96].

6

Mr. Ramun explained that while all scrap needed to be sorted down into separate groups of similar items, some kinds of scrap required specialized treatment. [*Id.*]. Per Mr. Ramun's example, brass scrap needed to be cleaned of steel and "shot with a gun" to determine the type and grade of the brass. [*Id.*, p. 97]. According to Mr. Ramun, the better the sorting and preparation that went into the scrapping process, the higher the price AED could receive for the scrap when it was sold. [*Id.*].

Mr. Ramun testified that the Youngstown site did not generate its own scrap and was instead a central processing facility at which primarily non-ferrous, complex scrap was broken down, segregated, cleaned, and stored until sold. [*Id.*, p. 36]. Mr. Ramun explained that equipment with specialized attachments are integral to the process because they perform the work of offloading, breaking down, and sorting various kinds of scrap. [*Id.*]. As an example of a specific process, Mr. Ramun stated that a conduit would be cut, the wires stripped out, and the resulting wire and conduit materials would be organized and sold. [*Id.*, p. 37]. Mr. Ramun later testified that the size of scrapped steel, also referred to as the "grade," played an integral role in the salability of the scrap, stating that smaller grade steel sold for a higher price. [*Id.*, p. 95].

AED's equipment and machinery spent about ninety-five percent of its time moving the materials through the scrap process or processing the materials, and about five percent of the time unloading unprocessed scrap, according to Mr. Ramun. [*Id.*, p. 38]. Mr. Ramun noted, however, that rock trucks were not used in scrap processing and were instead primarily used for loading and handling oversized pieces of scrap that would damage other equipment. [*Id.*, pp. 46, 133].

Next, counsel for the Trustee asked Mr. Ramun about the "C" Exhibits, all of which, according to Mr. Ramun, concerned intercompany invoices for transfers of equipment between AED and Gator. [*Id.*, pp. 50-51]. Mr. Ramun identified the "C" Exhibits[9] and described whether they related to scrap processing. [*Id.*, pp. 51-58]. He noted that Exhibits C-1 through C-4, C-6, C-7, C-10, C-13 through C-19, and C-22 through C-24 all related to repairs, upgrades, or work done on equipment used in processing scrap. [*Id.*]. Unlike the other "C" Exhibits, Mr. Ramun

---

9/ Mr. Ramun identified the C Exhibits as follows: C-1, Gator bucket hydraulic fittings [Doc. #582, p. 51]; C-2, same as C-1 [*Id.*]; C-3, same as C-1 [*Id.*]; C-4, same as C-1 [*Id.*]; C-5, equipment fittings for load out or shearing of scrap [*Id.*, pp. 52-53]; C-6, fittings and hoses for pressure washer [*Id.*, p. 53]; C-7, hose spring guard [*Id.*]; C-9, trailer fittings [*Id.*, p. 54]; C-10, forklift [*Id.*]; C-13, Cat 345 [*Id.*, p. 55]; C-14, VC1000 Komatsu excavator [*Id.*]; C-15, Cat 345 [*Id.*]; C-16, same as C-15 [*Id.*]; C-17, MT70 shear blades [*Id.*]; C-18, MT70 shims [*Id.*, pp. 55-56]; C-19, upgrade hoses for PC1100 [*Id.*, p. 56]; C-22, shear scuff plate [*Id.*, p. 57]; C-23, hoses and fittings for pressure washer [*Id.*]; and C-24, Cat 345 [*Id.*]. Mr. Ramun was unable to identify Exhibits C-8, C-11, C-12, C-20, and C-21 [*Id.*, pp. 54-57].

7

stated that Exhibit C-5 related to Gator equipment used to load out or shear scrapped tube at the Lorain jobsite. [*Id.*, pp. 50-57].

Turning to the "D" Exhibits, Mr. Ramun identified all 16 as invoices for repairs done to excavators used by AED in processing scrap at the Youngstown site. [*Id.*, pp. 57-58]. Counsel for the Trustee then directed Mr. Ramun to review the "E" Exhibits, only one of which he was able to identify, E-3, an invoice for work done to a rock truck engine. [*Id.*, pp. 58-59]. Mr. Ramun identified Exhibit F as an invoice for Black Beauty media, a blasting media used to finish castings for Gator, and Exhibit G as related to IDX drill bits and carbides for use with Gator's in-shop lathe. [*Id.*, pp. 59-60]. Exhibit H, per Mr. Ramun, related to rings used in gas lines in AED's manufacturing facility. [*Id.*, pp. 60-61].

Upon being presented with the "I" Exhibits, Mr. Ramun identified them as generally related to invoices for radiator/air conditioner work done on AED/Gator equipment. [*Id.*, p. 61]. Though unable to remember the specific equipment they pertained to at first glance, Mr. Ramun later identified almost all of the "I" Exhibits[10] by cross-referencing them with the Exhibit U equipment list, with Mr. Ramun pointing out that Exhibits I-1 through I-5, I-7 through I-9, I-11, and I-14 through I-19 related to equipment used either in processing scrap or assembling/repairing Gator-made attachments in Youngstown. [*Id.*, pp. 88-91]. All three "J" Exhibits, per Mr. Ramun's testimony, related to punch and chisel holders used by Gator in assembly. [*Id.*, p. 62]. Mr. Ramun also identified Exhibit K as an invoice for personal radiation detectors worn by employees who operated AED's "x-ray gun," a tool used to determine the metallurgical composition of certain kinds of scrap. [*Id.*, pp. 62-63]. Mr. Ramun testified that he was very familiar with all of the "L" Exhibits, explaining that each related to work/repairs performed by Ohio Cat employees who worked alongside AED in manufacturing Gator attachments for excavators. [*Id.*, pp. 63-64].

Exhibit M, Mr. Ramun stated, pertained to repairs and work done on the engines of Komatsu excavators used in the Youngstown scrap yard. [*Id.*, p. 65]. Mr. Ramun identified Exhibit N as related to tires for a Cat V80 forklift used by Gator in assembly, [*Id.*], Exhibit O as

---

10/  Mr. Ramun identified the I Exhibits as follows: I-1, front-end loader [Doc. #582, p. 88]; I-2, excavator upgrades [*Id.*]; I-3, excavator [*Id.*]; I-4, excavator [*Id.*]; I-5, 312 excavator [*Id.*, p. 89]; I-6, tractor [*Id.*]; I-7, rock truck [*Id.*; Doc. #583, p. 17]; I-8, 312 Cat excavator [*Id.*; Doc. #583, p. 17]; I-9, rock truck [Doc. #582, p. 89]; I-11, PC1100 excavator [*Id.*, p. 90]; I-12, rock truck [*Id.*]; I-13, construction lull [*Id.*]; I-14, DP-40 scrapyard forklift [*Id.*]; I-15, PC400 Komatsu [*Id.*]; I-16, PC1000 excavator [*Id.*]; I-17, PC400 Komatsu excavator [*Id.*, pp. 90-91]; I-18, PC1100 excavator being upgraded by Gator [*Id.*, p. 91]; I-19, scrap processing loader [*Id.*]; and I-21, Peterbilt tractor [*Id.*]. Mr. Ramun was unable to identify Exhibits I-10 and I-20. [*Id.*, pp. 90, 91].

16-40675-jpg    Doc 639    FILED 04/22/19    ENTERED 04/22/19 16:18:51    Page 8 of 35

related to new rails for the undercarriage of a Youngstown excavator [*Id.*, pp. 65-66], Exhibit P as related to payment for disposal of materials generated by Youngstown scrap processing, [*Id.*, p. 66], and Exhibit Q as related to matting material used to line excavator cabs. [*Id.*]. Mr. Ramun also identified all of the "R" Exhibits[11] as relating to equipment purchases, noting that Exhibits R-1 through R-9, R-11, R-12, R-16, and R-17 related to Gator purchases of equipment to be used in either current or future manufacturing. [*Id.*, pp. 66-78]. Mr. Ramun stated that Exhibits R-8 through R-13, R-17, and R-19 detailed auction purchases that were conducted somewhere other than the seller's place of business. [*Id.*, pp. 69-79].

Mr. Ramun then identified Exhibit W[12] as a list of common vendors and common purchases made by AED and Gator. [*Id.*, pp. 79-83]. Mr. Ramun explained that the Exhibit W list represented the potentially tax exempt purchases made/expenses incurred by AED and Gator that could not be linked to a specific invoice as he had done with prior exhibits. [*Id.*, pp. 82-83]. In other words, per Mr. Ramun, Exhibit W served as placeholder list of common purchases/expenses where a corresponding invoice could not be located and had not been produced. [*Id.*].

Upon being cross-examined by counsel for ODT, Mr. Ramun stated that he was not personally involved in the audit process when it began and that, per his understanding, two other individuals, Jim Shibble ("Mr. Shibble") and Tom Anness ("Mr. Anness"), acted on behalf of AED/Gator in assisting ODT with the audit when it first began. [*Id.*, pp. 100-01]. Mr. Ramun explained that he became involved in the audit process around the end of 2015 or the beginning of 2016, though he had no direct contact with the auditors. [*Id.*, pp. 101, 103-04]. Mr. Ramun further explained that he had previously examined AED/Gator invoices to assist Mr. Shibble and Mark Thomas ("Mr. Thomas"), an accountant working on the AED/Gator account, as they tried to

---

11/ Mr. Ramun identified the R Exhibits as follows: R-1, MT100 large shear [Doc. #582, p. 67]; R-2, MT40 shear [*Id.*, p. 68]; R-3, MT40 shear [*Id.*]; R-4, MT40 shear jaw set [*Id.*]; R-5, MT20 shear jaw set [*Id.*, p. 69]; R-6, MT90 shear jaw set [*Id.*]; R-7, MT90 shear [*Id.*]; R-8, Yoder and Frey auction purchase, including Komatsu PC1100 and manlifts [*Id.*, pp. 69-70]; R-9, Hilco auction purchase of crane equipment [*Id.*, pp. 70, 74]; R-10, Lyon auction purchase of equipment, including welders and diesel generator [*Id.*, pp. 71, 75]; R-11, Maynards auction purchase of equipment, including Lamina hydraulic drill cart parts [*Id.*, pp. 71-72, 75]; R-12, purchase of AC1100 from Worldwide Machinery [*Id.*, p. 72]; R-13, purchase from Ritchie Brothers [*Id.*, p. 73]; R-14, security satellite dish system [*Id.*]; R-15, security system server and upgrade (never fully received by AED) [*Id.*, p. 77]; R-16, one-time-use inventory storage containers [*Id.*]; R-17, trailers used in the scrap yard [*Id.*, pp. 77-78]; R-18, two blasting containers [*Id.*, p. 78]; and R-19, shoring towers intended for future use [*Id.*, pp. 78-79].

12/ Exhibit W was prepared by the Trustee prior to trial and was not produced during discovery. However, Exhibit W was admitted without objection. [Doc. #583, p. 79].

16-40675-jpg     Doc 639     FILED 04/22/19     ENTERED 04/22/19 16:18:51     Page 9 of 35

determine which transactions were taxable or not for purposes of the audit. [*Id.*, pp. 110-13]. Mr. Ramun was unsure as to exactly how many invoices were available to Mr. Shibble and Mr. Thomas when they made their taxable transaction projections during the audit process. [*Id.*, pp. 110-12]. Mr. Ramun also stated that he had performed the invoice identification process four times and that he was fairly certain that he was getting the same results each time. [*Id.*, p. 130].

On redirect, Mr. Ramun described the work done by rock trucks, stating that the rock trucks were non-public road vehicles used to transport large, heavy pieces of scrap that would damage other pieces of equipment. [*Id.*, p. 133].

### A-II.  Mr. Shibble's Testimony

Mr. Shibble was then called to the stand, testifying that he is an accountant who had been working on ACI's financials since he was assigned the account by his firm in 2003. [*Id.*, pp. 143-44]. Mr. Shibble testified that he was involved in the ODT audit of ACI and that he, along with Mr. Anness, worked with the audit manager, Margaret Rhodes ("Ms. Rhodes"), and the auditor, Susan Wash ("Ms. Wash"). [*Id.*, p. 145]. Mr. Shibble testified that he complied with the auditor's requests as best as he was able, noting that ACI was unable to produce a number of invoices and that, just after ACI filed for bankruptcy, he tasked Mr. Ramun with finding the missing ones. [*Id.*, p. 147].

According to Mr. Shibble, Ms. Wash's questions and requests regarding the Lorain jobsite indicated to him that she did not have an accurate understanding of the nature of the scrapping work that went on there. [*Id.*, p. 148]. Mr. Shibble testified that the auditors did not ask many questions about the work that went on in Youngstown, stating that, per his impression, the auditors recognized that the Youngstown jobsite qualified as a manufacturing facility entitled to exemptions. [*Id.*, p. 149]. After touring the Youngstown jobsite in May of 2015, per Mr. Shibble's recollection, Ms. Wash issued a preliminary assessment in the form of a spreadsheet. [*Id.*, pp. 149-50]. Mr. Shibble identified Exhibit V as that spreadsheet, noting that Mr. Ramun had added comments to it related to the invoices previously described. [*Id.*, p. 151].

When asked to further explain how the Exhibit V spreadsheet was created, Mr. Shibble explained that it initially contained only the auditor's preliminary assessment of ACI's use tax liability. [*Id.*, p. 147]. After the spreadsheet was given to ACI, Mr. Shibble, Mr. Ramun, and Mr. Thomas went over its contents, adding comments and notes indicating whether particular purchases/expenses were, in their opinion, taxable or exempt. [*Id.*, p. 159]. Mr. Shibble testified

16-40675-jpg    Doc 639    FILED 04/22/19    ENTERED 04/22/19 16:18:51    Page 10 of 35

that while the three of them were able to locate a number of missing invoices when first reviewing the spreadsheet, many still remained missing during the audit and, for every transaction not connected to an invoice, ACI was assessed use tax by ODT. [*Id.*, pp. 159-60].

Upon being asked about the janitorial service assessment, Mr. Shibble testified that ACI's bookkeepers had misclassified janitorial expenses and that, as a result, the estimated tax liability figures had been skewed upward. [*Id.*, pp. 151-52, 184]. Mr. Shibble laid out specifically how that happened, explaining that, for the representative sample year of 2013 utilized in the audit, ACI spent $54,000.00 in janitorial services and, due to a business slowdown, only $10,000.00 in general contracting. [*Id.*, p. 151]. Because the janitorial services were improperly included in the same category as general contracting, the resulting rate of taxable expenses, around 90% (or $54,000.00 divided by $64,000.00), was significantly larger than it would be in other years when contracting expenses were at more normal levels. [*Id.*, pp. 152-53]. Had the janitorial service expenses not been misclassified, Mr. Shibble testified, the resulting tax estimate would have been around $364,000.00, a figure that reasonably matched up with ACI's 1099s filed during the audit period. [*Id.*, pp. 152, 160]. Mr. Shibble subsequently identified the "S" Exhibits as the 1099s that were issued by ACI to the providers of janitorial services rendered during the audit period. [*Id.*, p. 154-55].

On cross-examination, Mr. Shibble identified Joint Exhibit F as an agreement between ACI and ODT that set forth the mutually agreed upon parameters of the audit, one of which was that the audit would use the sample year of 2013 to estimate taxable expenses. [*Id.*, p. 161]. Mr. Shibble also identified Exhibit 3 as the preliminary assessment spreadsheet in its pre-comment, original form as provided to ACI by ODT's auditor. [*Id.*, pp. 162-63]. Mr. Shibble admitted that, when adding comments to the spreadsheet, he relied on Mr. Ramun for information related to AED/Gator's equipment as he had no independent knowledge regarding how equipment was used by AED/Gator. [*Id.*, p. 166-67]. Mr. Shibble also admitted that he did not accompany the auditor on either of the site tours performed, and did not know what she was shown. [*Id.*, p. 175].

When asked to identify Exhibit 28, Mr. Shibble explained that it was an open purchase order that contained information regarding what was done at the Lorain jobsite. [*Id.*, pp. 175-76]. Counsel for ODT then turned Mr. Shibble's attention to Exhibit 78, which Mr. Shibble identified as computerized daily reports ("CDR") that detail the kind of work done at the Lorain jobsite, and Exhibit 79, which Mr. Shibble identified as scrap summaries provided to the auditor as she

11

requested. [*Id.*, pp. 177, 180].

### A-III.   Mr. Thomas' Testimony

Mr. Thomas then took the stand and testified that he was a semi-retired tax-specialist accountant with experience in Ohio use tax audits. [*Id.*, pp. 189-91].   Mr. Thomas explained that he had prior experience both as an agent for ODT and as a regional supervisor in charge of Youngstown-area Ohio tax audits. [*Id.*, pp. 191-92].   Mr. Thomas testified that he was very familiar with the tax audit process and that he had expertise in manufacturing tax issues, estimating that he had played a role in hundreds of audits while previously working for ODT. [*Id.*, pp. 194-95; Ex. T].   Mr. Thomas explained that he became involved in ACI's audit after being contacted by the Trustee.   According to Mr, Thomas, the Trustee wanted him to "work the audit" and review exemption/taxability issues. [*Id.*, pp. 198-99].

Mr. Thomas identified Exhibit V as the spreadsheet he had worked on while working for the Trustee, explaining that he had expanded its contents based on his knowledge of what was, and was not, exempt from use tax assessment. [*Id.*, pp. 201-02].   Mr. Thomas testified that while working with Mr. Ramun and Mr. Shibble in reviewing/updating the Exhibit V spreadsheet, he did not alter or change "the amount, the finding code, the description, custom one, level one, date, name, measure and ID number" columns. [*Id.*, pp. 203-04].   According to Mr. Thomas, the only items he changed were those under the "exempt, taxable, missing invoice, [and] undetermined" columns, noting that, when they could find corresponding invoices, he would make a determination as to whether the expense/purchase was exempt from Ohio use tax or not. [*Id.*, p. 204].

Counsel for the Trustee turned Mr. Thomas' attention to Exhibit T, which he identified as the expert report he prepared for the court. [*Id.*, p. 205].   In the Exhibit T report, Mr. Thomas detailed his findings with reference to how the equipment in question was used. [*Id.*, p. 207].   He stated that, for use tax purposes, whether AED or a third party paid Gator for a particular piece of equipment was irrelevant. [*Id.*].   Mr. Thomas further illustrated how, per his understanding, manufacturing exemptions from Ohio use tax work, noting that, between two forklifts, one might be exempt because it was used during the manufacturing process while the other might be taxable because it was primarily used to load raw materials and finished goods. [*Id.*, p. 208].

On page 6 of Exhibit T, Mr. Thomas testified that he utilized item numbers that corresponded with particular descriptions of potentially tax exempt equipment/services as follows:

12

Number 1, shears, excavators, and related repairs; Number 2, Gator product-manufactured parts; Number 3, forklifts and cranes; Number 4, casual sale exemptions, Number 5, exempt services (asbestos removal and trash removal); Number 6, tax already paid on purchases; Number 7, real property installation; Number 8, stipulated deductions;[13] and Number 9, janitorial services. [*Id.*, pp. 205-09, 217- 220].

When asked to explain his understanding of the casual sales exemption, Mr. Thomas stated that the casual sales exemption applies when a seller sells goods that they are not in the business of selling. [*Id.*, p. 209].   In the context of auction sales, Mr. Thomas explained, auction sales that took place at the auctioneer's place of business do not qualify for casual sale exemption. [*Id.*]. On the other hand, an auction sale that took place, for example, at the location of the company having its assets sold, would generally qualify for a casual sale exemption. [*Id.*].   Counsel for the Trustee then turned Mr. Thomas' attention to Exhibits R-8 through R-19 and Mr. Thomas stated that, in his opinion, Exhibits R-8 through R-13 and Exhibits R-17 and R-19 were for "casual sale" exempt purchases because each detailed an auction purchase that took place at a location other than the auctioneer's headquarters. [*Id.*, pp. 209-17].   Mr. Thomas noted that some items, such as Exhibits R-17 and R-19, could be exempt under both the manufacturing and casual sales exemptions. [*Id.*, p. 215].

In terms of items listed under Number 5, "exempt services," Mr. Thomas explained that certain services, including asbestos and trash removal, are not subject to Ohio use tax. [*Id.*, p. 217]. Mr. Thomas also explained that the Number 7 items related to real property installations. [*Id.*, p. 219].   He stated that when a contractor installs improvements on real property, only the seller-contractor is liable for sales/use tax, not the buyer. [*Id.*].   Counsel for the Trustee then asked Mr. Thomas about Joint Exhibit F, a document Mr. Thomas identified as a typical form letter of agreement used during Ohio tax audits that he was very familiar with. [*Id.*, p. 222].   Mr. Thomas stated that, in his experience, even where form letters of agreement like Joint Exhibit F are used, when taxpayers were able to show that the representative sample used was inaccurate, they could challenge assessments related to the inaccurate representative sample. [*Id.*, pp. 222-23]. However, Mr. Thomas stated that taxpayer challenges to representative samples were rare in his experience. [*Id.*, p. 223].

---

13/   The parties agreed that Number 8 on page 6 of Exhibit V represented a deduction from ACI's tax liability already stipulated to by the parties as reflected on Stipulation Number 20. [Doc. #561, p. 3].

Mr. Thomas stated that, in his opinion, the work that went on at ACI's Youngstown scrapyard qualified as a manufacturing operation and that cutting, shaping, and sorting scrap constitutes a part of the manufacturing process. [*Id.*, pp. 223-25]. Mr. Thomas stated that his comments were based on his understanding that dismantling work, specifically that of a large building, was being done by AED in Lorain. [*Id.*, 224]. This understanding was contrary to Mr. Ramun's earlier testimony. [*Id.*, pp. 27-28].

Mr. Thomas further opined that, in his view, scrap materials were committed to the manufacturing process when they were created by the act of dismantling, with the manufacturing process ending once the scrap had been cut and sorted into final piles of salable, finished product. [*Id.*, pp. 225-26]. Per his calculations laid out on page 6 of Exhibit T, Mr. Thomas opined that ODT's original assessment of $746,881.44 should be reduced by $615,711.00, resulting in an ACI use tax liability of $131,170.44 before interest and penalties. [*Id.*, pp. 226-27]. Mr. Thomas testified that the 15% penalty and interest assessment would increase that figure. [*Id.*, p. 227].

**B.     Day Two of the Trial on the Trustee's Objection**

**B-I.     Mr. Thomas' Testimony, Continued**

On cross-examination, Mr. Thomas confirmed that his opinion of ACI's use tax liability relied on Exhibits T and V. [Doc. #583, p. 4]. Mr. Thomas also stated that he did not have the tools needed to calculate the interest penalty due on ACI's use tax because he lacked access to ODT's OFAST tax software, a program he had last used when he worked for ODT. [*Id.*, p. 5]. When asked questions about what went into the preparation of his expert report, Mr. Thomas explained that he and Mr. Ramun cross-referenced invoices with Exhibit V. [*Id.*, p. 7]. Mr. Thomas further explained that the majority of his work on ACI's tax issues took place during one face-to-face meeting with Mr. Ramun and Mr. Shibble in December of 2017,[14] noting that, in addition to invoices and Exhibit V, he reviewed ODT's proof of claim and the auditor's remarks in the Joint Exhibit B audit report. [*Id.*, pp. 7-8].

Counsel for ODT asked Mr. Thomas where in the audit remarks document, Joint Exhibit B, it stated that the auditor did not have time to complete the audit. [*Id.*, p. 11]. In response, Mr. Thomas clarified that, because the audit was interrupted by ACI's bankruptcy filing, he considered it generally accurate to state that the auditor did not have enough time to complete the audit. [*Id.*,

---

14/   The court notes that this work was done prior to the issuance of the Ohio Supreme Court's decision in *Lafarge* on May 31, 2018.

16-40675-jpg    Doc 639    FILED 04/22/19    ENTERED 04/22/19 16:18:51    Page 14 of 35

p. 11].   Noting that the ACI audit had been ongoing for two years by the time ACI filed for bankruptcy, Mr. Thomas testified that, although he was not involved from the start, he could not be sure whether ACI's audit should have taken longer than two years to complete. [*Id.*, pp. 12-13].

Mr. Thomas admitted that his opinion on manufacturing tax law came from his experience as an auditor and audit manager and that he did not tour the Youngstown facility nor witness any of its operations. [*Id.*, pp. 14-15].   Mr. Thomas also admitted that his Ohio use tax determinations relied on Mr. Ramun's explanations of how AED/Gator's equipment was used. [*Id.*, pp. 15-16]. Turning to the last page of Exhibit V, Mr. Thomas identified it as an asset list he reviewed, noting that, in addition to the comments he provided under the Skoda Minotti column, he may have changed "a couple at best" of the comments originally written down by Mr. Shibble and Mr. Ramun in the left-adjacent column. [*Id.*, pp. 16-17].   In terms of his use tax determinations, Mr. Thomas stated that, where Mr. Ramun and Mr. Shibble indicated that a particular piece of equipment was used in manufacturing and scrap processing, he determined it to be exempt from use tax. [*Id.*, p. 19].

Mr. Thomas clarified that, where possible, he and Mr. Ramun and Mr, Shibble discussed exactly what the piece of equipment in question was and what it was used for. [*Id.*, pp. 19-20]. Mr. Thomas stated that he only determined a piece of equipment to be exempt if he had an actual invoice or the specific word of Mr. Ramun or Mr. Shibble to rely on. [*Id.*, pp. 21-22].   In terms of typical audit processes, Mr. Thomas testified that the process he, Mr. Ramun, and Mr. Shibble utilized in reviewing ODT's use tax assessment was similar to the process he used while working as an audit manager for ODT. [*Id.*, p. 25].

Counsel for ODT then asked Mr. Thomas about Gator attachments, with Mr. Thomas explaining that, while he was not specifically aware of how grapples are used, equipment used to sort or move materials around could be considered manufacturing because they move a product or sort materials for sale. [*Id.*, pp. 28-29].   Mr. Thomas further explained that many pieces of equipment, including forklifts and front loaders, could be used for both taxable and exempt purposes and that a closer examination was warranted in those cases. [*Id.*, pp. 29-30].   While looking at the Number 1 items listed on Page 6 of Exhibit T, Mr. Thomas explained that all items listed as Number 1 were scrap processing equipment, whereas Numbers 2 and 3 were for Gator manufacturing. [*Id.*, pp. 32-33].   Mr. Thomas clarified that if an invoice could not be deciphered, the related equipment would be determined taxable. [*Id.*, p. 35].

When asked about how he made casual sale determinations when reviewing the "R" Exhibits, Mr. Thomas explained that he relied on Mr. Ramun when the related invoice did not state where the purchase took place, noting that he did not know what FOB meant as a shipping term of art. [*Id.*, pp. 40-41]. Turning to the Exhibit S 1099s for janitorial services, Mr. Thomas explained that Mr. Shibble had reviewed them and provided him with actual janitorial expense figures, which allowed him to calculate that ACI should have had a janitorial services tax liability of around $25,000.00 instead of ODT's $84,000.00 figure. [*Id.*, pp. 42-43]. Mr. Thomas admitted that he did not review the expenses contained in the janitorial services/general contracting account for the entire audit period, instead relying on the same representative sampling method used by ODT (and the 1099s) in determining that ACI's janitorial tax liability was overstated. [*Id.*, pp. 43-44].

Turning back to his Exhibit T expert report, Mr. Thomas explained that he calculated the exemption/taxability of Number 7 items, covering construction contracts, using the same representative sample methodology as used by ODT. [*Id.*, pp. 47-48].

Mr. Thomas further explained that representative sampling methods utilize an error rate when calculating an ultimate tax burden and that was why some of the figures did not match up with actual expenses. [*Id.*, pp. 48-49]. Mr. Thomas noted that he calculated his own applicable error rates instead of relying on those used by ODT and that his calculations themselves were not included in his expert report. [*Id.*, pp. 49-50]. When asked about the foundation of his opinion, Mr. Thomas stated that it was based on his years of experience as an auditor. [*Id.*, p. 50].

Counsel for ODT then turned Mr. Thomas' attention to Exhibit 1, an earlier form of his expert report that differed from Exhibit T. [*Id.*, p. 51]. Mr. Thomas explained that the difference in numbers could be attributed to his earlier error of figuring that on-road trailers and trucks were taxable. [*Id.*, pp. 51-52]. After he was told by Mr. Ramun and Mr. Shibble, through counsel for the Trustee, that those trailers and trucks were used in scrap processing manufacturing, Mr. Thomas adjusted his exemption numbers upward. [*Id.*, p. 52]. Mr. Thomas also explained that his earlier Exhibit 1 report included interest calculations whereas his final Exhibit T report did not, further accounting for the differences between the two exhibits. [*Id.*, pp. 52-53].

On redirect, Mr. Thomas reiterated that, in his opinion, pre-processing sorting and segregating of raw materials are parts of the manufacturing process in a scrapping operation. [*Id.*, p. 56]. Mr. Thomas further opined that the unprocessed scrap metals sent to Youngstown from

16

AED's various out-of-state dismantling sites[15] were unprocessed materials. [*Id.*]. Mr. Thomas also stated that, even where an invoice could not be found, expenses/purchases could still qualify as exempt under an audit if particular vendors only supplied exemptible types of services. [*Id.*, p. 62]. Overall, Mr. Thomas stated, the purpose of a use tax audit is to calculate an accurate, actual tax liability. [*Id.*, pp. 63-64]. With regards to equipment used for both taxable and nontaxable purposes, Mr. Thomas stated that his communications with Mr. Ramun and Mr. Shibble led him to believe that most of AED/Gator's equipment in question either clearly qualified as exempt or was clearly taxable. [*Id.*, p. 66].

Upon being asked by the court, Mr. Thomas clarified that while repairs on exempt manufacturing equipment would also be exempt, repairs on casual sale exempt equipment would not necessarily be exempt. [*Id.*, p. 72]. After the admission of Exhibits A through W, and the parties' stipulations as contained in Joint Exhibit G, counsel for the Trustee rested his case. [*Id.*, pp. 77-80].

### B-II. Ms. Wash's Testimony

Upon being called to the stand by counsel for ODT, Ms. Wash testified that she has worked as a tax examiner for ODT since 2011 and that her job is to audit Northeast Ohio companies with a focus on sales, use, and employer withholding tax. [*Id.*, p. 83]. Ms. Wash testified that she is experienced in manufacturer tax issues and has conducted 70 to 80 audits during her career at ODT, with around 20 or so having involved manufacturing issues. [*Id.*]. In terms of audit length, Ms. Wash stated that manufacturer audits generally take about a year, but can take up to two years on average. [*Id.*, p. 84].

Ms. Wash identified Joint Exhibit B as the audit remarks she completed while performing her audit of ACI. [*Id.*]. Ms. Wash stated that she was assigned the AED case after she completed a use tax education program, explaining that AED was unregistered with ODT for use tax purposes and had not been filing use tax returns. [*Id.*, p. 85]. Though initially unsure of the date when the AED audit began, Ms. Wash later recalled that it began in May of 2014. [*Id.*, p. 87].

Ms. Wash identified Exhibit 23 as a declaration of tax representative form that indicated that Mr. Anness was AED's tax representative. [*Id.*, p. 88]. She explained that these forms established a taxpayer point of contact to facilitate audit communications. [*Id.*]. Ms. Wash noted

---

15/ All dismantling work performed during the audit period took place in locations outside the state of Ohio. [Doc. #582, p. 30].

that authorized tax representative communications can increase or decrease a taxpayer's liability and that AED's declaration of tax representative form contained no restrictions on Mr. Anness' ability to speak on behalf of AED. [*Id.*, pp. 88-89]. Because the tax representative declarations expire after one year, AED filed a second declaration as the audit entered its second year, mirroring the first declaration. [*Id.*, p. 89]. Ms. Wash testified that she also discussed the AED audit with Mr. Shibble, explaining that, per her understanding, Mr. Shibble was acting at Mr. Anness' direction. [*Id.*, p. 90].

Counsel for ODT turned Ms. Wash's attention to Exhibit 26, a document she identified as one of many "taxpayer information reports" signed by Mr. Anness that she received while conducting AED's audit. [*Id.*, pp. 90-91]. Ms. Wash then identified Exhibit 69 as an early chart of AED's accounts that she used when performing the audit. [*Id.*, pp. 91-92]. Exhibit 74 was identified as an AED job list, a list that stated that, during the audit period, the only offsite job being performed by AED in Ohio took place in Lorain. [*Id.*, pp. 92-93]. Ms. Wash also identified Exhibit 62 as AED's asset list that she used to perform the audit, noting that she originally received a list from AED that contained information beyond the scope of the five year audit period. [*Id.*, pp. 93-94]. At some point in the audit, Ms. Wash testified that her AED point of contact changed from Mr. Anness to Mr. Shibble, a transition she did not consider strange. [*Id.*, pp. 94-95].

After receiving the initial audit documents from AED, Ms. Wash testified that she held an audit meeting attended by audit manager Ms. Rhodes, Mr. Anness, and Mr. Shibble. [*Id.*, p. 96]. At the meeting, they discussed the scope of the audit, the nature of AED's work, and proposed sample methodologies, among other things. [*Id.*, pp. 96-97]. Ms. Wash testified that, after the audit meeting, she was given a vehicle tour of AED's Youngstown facilities after being told an on-foot plant tour would be too dangerous given the work that was being done. [*Id.*, p. 97].

Ms. Wash testified that she utilized the Exhibit 69 chart of accounts to identify AED accounts where a tax might be assessed, noting that she did not review all of the charts of accounts. [*Id.*, pp. 98-99]. After narrowing down the AED accounts of interest, Ms. Wash testified that she created a list of the account charts that she wanted to review, a list she identified as Exhibit 71. [*Id.*, p. 100]. Ms. Wash testified that it took AED approximately six months to provide responses to her Exhibit 71 chart of accounts request, noting that it was not typical to have to follow up as much she did in seeking the requested charts. [*Id.*, p. 101].

In terms of the audit process, Ms. Wash explained that once she received the relevant charts

18

of accounts, she would then request general ledger details that provided information specific enough to start pulling individual invoices for tax assessment. [*Id.*, p. 102]. Ms. Wash identified Exhibit 29 as the general ledger detail she received from Mr. Shibble while conducting the AED audit. [*Id.*, p. 102]. Ms. Wash testified that during the AED audit, she only received a small portion of the invoices she requested via email and that, when she went to Mr. Anness and Mr. Shibble's office to review other invoices, many were still missing and/or misfiled. [*Id.*, p. 104]. Ms. Wash explained that many of the invoices were boxed out-of-order and organized in a way that made reviewing them difficult. [*Id.*, p. 105]. Many of the invoices lacked detail, requiring further requests for information from AED. [*Id.*, pp. 105-06].

When an invoice was deemed missing, Ms. Wash explained, the related transaction was coded as taxable until/unless the invoice could be located. [*Id.*, p. 106]. While she conducted her review of materials at Mr. Anness and Mr. Shibble's office, Ms. Wash would bring her requests for further information to Mr. Shibble down the hall. [*Id.*, p. 107]. While Mr. Shibble was able to answer some of her questions, Ms. Wash testified, he was unable to answer others and would have to contact AED directly. [*Id.*, pp. 107-08].

Turning to Exhibit 50, Ms. Wash identified it as the email she sent to Mr. Shibble that contained the taxable transactions list, a list that contained her initial findings, requests for further information from AED, and a response deadline. [*Id.*, p. 108]. Identifying Exhibit 5 as the taxable transactions list itself, Ms. Wash stated that AED did not comply with the deadline provided for in Exhibit 50 and that she never received any comments from AED related to the taxable transactions list. [*Id.*, p. 109]. Ms. Wash then identified Exhibit V as a version of the taxable transactions list that contained comments and columns that she had not seen before. [*Id.*, p. 111]. Ms. Wash noted that some of her original comments from the Exhibit 5 version of the list had been changed in the Exhibit V version. [*Id.*, p. 112].

Counsel for ODT then turned Ms. Wash's attention to Exhibit 73, a report she identified as a breakdown of her review of AED's accounts, including the sample amount of accounts found taxable and a corresponding error rate. [*Id.*, pp. 114-15]. Ms. Wash also identified the Joint Exhibit F audit letter of agreement, noting that it states how expenses were reviewed, the sample period used, and how the audit assessment would be calculated. [*Id.*, p. 117].

Ms. Wash laid out the process through which AED's audit assessment was made with regard to expenses: once an expense account category's error rate was calculated by dividing the

19

account's taxable amount during the sample period by the amount of transactions actually reviewed, the error rate is "multiplied by the account balances provided on the trial balance for the entire audit period." [*Id.*, pp. 118-19].   Trial account balances, Ms. Wash explained, represent the total dollar amount of account transactions during the period at issue. [*Id.*, p. 119].   The total account balance column on Exhibit 73, Ms. Wash explained, was the sum of the trial balance amounts for the audit period for a particular account category. [*Id.*, p. 120].   Per Ms. Wash, once the trial account balance is multiplied by the applicable error rate, an extrapolated base is produced, a figure that is then used to calculate the tax due using the applicable tax rate. [*Id.*, pp. 120-21].

Unlike expenses, potentially taxable fixed assets are reviewed comprehensively by auditors based on a review of a taxpayer-prepared fixed asset list. [*Id.*, p. 122].   Upon receiving AED's fixed asset list, Ms. Wash testified that she used that list to identify and request transaction-specific invoices, and after receiving some of those invoices, she conducted a second tour of the Youngstown facilities, this time on foot. [*Id.*, pp. 122-23].

During the on-foot Youngstown site tour, Ms. Wash testified that she reviewed pieces of equipment and saw AED employees performing work. [*Id.*, p. 123].   Although she had a better understanding of AED's work, Ms. Wash still had questions after the tour. [*Id.*, pp. 123-24].   In Ms. Wash's view, AED's work consisted of scrap manufacturing where scrap was put through a process that made it salable. [*Id.*, p. 125].   Ms. Wash testified that she made her taxable/exempt determination by looking at whether equipment was used directly in the manufacturing process - be it while scrap moved along the processing line, or where direct work was done on metals being processed. [*Id.*, pp. 125-26].   On-site walkthrough aside, Ms. Wash testified, she still relied on AED's representations when making her taxability determinations. [*Id.*, p. 126].

As for the Lorain jobsite, Ms. Wash testified that Mr. Anness and Mr. Shibble both told her that AED dismantling work was being done there. [*Id.*, pp. 126-27].   Per Ms. Wash's testimony, she was told that manufacturing began at the Lorain jobsite and that the equipment involved should be deemed exempt. [*Id.*, p. 127].   Ms. Wash then identified Exhibit 28 as the Lorain jobsite purchase order, stating that it did not provide her with enough detail for her to make taxability determinations. [*Id.*, pp. 127-28].   Ms. Wash also identified Exhibit 78 as the Lorain jobsite CDR reports and Exhibit 79 as Lorain scrap summaries, testifying that both documents were vague and did not provide enough information for her to make taxability determinations. [*Id.*, pp. 129-30].

20

When asked to further describe the threshold for determining that a piece of equipment was exempt as being used in manufacturing, Ms. Wash testified that equipment used to change the form of, or prepare scrap, would qualify as exempt, whereas "just cutting it up or prepping it to be shipped off" would not qualify. [*Id.*]. Ms. Wash testified that, with regards to the Lorain jobsite, AED did not provide enough information for the auditors to determine where dismantling ended and manufacturing began. [*Id.*, p. 131]. Ms. Wash stated that, in terms of fixed assets, if the auditors could see that the assets were used directly in the manufacturing process, they determined them exempt. [*Id.*, pp. 132-32].

Ms. Wash then identified Exhibit 66 as a summary of the auditor's tax determination broken down between expenses and fixed assets. [*Id.*, p. 132]. Exhibit 75, Ms. Wash testified, was the initial tax assessment summary, a summary that was later revised downwards once AED produced missing invoices indicating that AED had already paid tax upfront. [*Id.*, p. 133]. After receiving some additional documents and invoices, Ms. Wash testified that AED's tax liability was reduced by $14,167.49. [*Id.*, p. 134]. An adjusted, current summary of AED's tax liability was created, a document Ms. Wash identified as Joint Exhibit E. [*Id.*, pp. 134-35]. Ms. Wash noted that part of the reduction in AED's tax liability was based upon the deduction of asbestos removal expenses. [*Id.*, p. 135].

Upon being asked whether Exhibit R-12 provided information detailing where the auction it describes was held, Ms. Wash testified that it did not.[16] [*Id.*, p. 137].

On cross-examination, Ms. Wash testified that, when she began work on AED's audit, she had likely completed six, seven, or maybe eight manufacturing audits, and that AED's audit was her first involving scrap processing. [*Id.*, p. 139]. When asked about cutting materials, Ms. Wash testified that cutting can be a part of the manufacturing process because it can change the shape or form of materials being processed. [*Id.*, p. 140]. Ms. Wash also stated that, in order to determine how to process materials, sorting may be necessary on the part of a scrap manufacturer. [*Id.*].

Ms. Wash testified that "trying to convert material scrap that had been delivered to [AED's] site into a product that could then be sold" would fall within the definition of a manufacturing

---

16/ Mr. Ramun testified that the auction purchase of equipment evidenced by Exhibit R-12, equipment he personally inspected prior to a purchase he personally authorized, took place at the original equipment owner's location, not the auctioneer's location. [Doc. #582, pp. 72-73]. With reference to Mr. Ramun's testimony, Mr. Thomas testified that Exhibit R-12 evidenced an auction purchase expense that was exempt as a "casual sale." [*Id.*, pp. 212-13]. This court required similar types of testimonial corroboration of the Trustee's documentary evidence with regard to all of the Trustee's claims of use tax exemption.

16-40675-jpg    Doc 639    FILED 04/22/19    ENTERED 04/22/19 16:18:51    Page 21 of 35

operation. [*Id.*]. Counsel for the Trustee asked Ms. Wash how she came to conclude that dismantling work had been done at the Lorain jobsite, and she responded that she had been told as much by both Mr. Anness and Mr. Shibble on multiple occasions. [*Id.*, pp. 141-42, 144]. When asked whether Exhibit 28, the Lorain jobsite purchase agreement, mentioned dismantling, Ms. Wash stated that it did not, clarifying that it was her understanding that AED was generally in the business of dismantling old steel mills. [*Id.*, p. 144].

Despite her understanding of what AED did at the Lorain jobsite, Ms. Wash testified that there was no written documentation that confirmed that AED did dismantling at the Lorain jobsite. [*Id.*, p. 146]. Instead, Ms. Wash testified, the documentation provided did indicate that scrap processing went on at the Lorain jobsite [*Id.*, pp. 146, 147]. Ms. Wash testified that she determined that some of the potentially taxable equipment was located at the Lorain jobsite because, per her understanding, the equipment was used in the dismantling process, a process she understood as occurring (in Ohio) only at the Lorain location. [*Id.*, p. 147]. In terms of repairs on exempt equipment, Ms. Wash stated that, had she received additional information, it was possible that she would have been able to determine that some of the equipment was located in Youngstown and that the repairs/replacements were done on Youngstown-located equipment. [*Id.*, p. 150].

When asked when the manufacturing process began, Ms. Wash stated that it depended on the scrap in question, explaining that AED's processes varied depending on the customer. [*Id.*, pp. 151-52]. Ms. Wash could not identify Exhibit R-1 and testified that she utilized her spreadsheet in making taxability determinations. [*Id.*, pp. 152-53]. Ms. Wash identified the first transactions on Exhibit 64 as related to machinery used in dismantling and that, per her understanding, the machinery was taxable and had to have been located in Lorain because that was the only place where AED was doing dismantling work. [*Id.*, p. 156]. Ms. Wash testified that, per her understanding, all dismantling machines were located in Lorain. [*Id.*, p. 157].

With regards to missing invoices, Ms. Wash testified that, as part of AED's audit, she made taxability determinations even where an invoice was missing when she was able to review similar invoices from the same vendor. [*Id.*, p. 159].

On redirect, Ms. Wash testified that she did not see any excavators, front-loaders, or 30,000 pound forklifts at the Youngstown facility during her on-foot tour. [*Id.*, pp. 176-77]. Ms. Wash also stated that she had never seen Exhibit U before. [*Id.*, p. 177]. Ms. Wash also testified that she could not calculate AED's tax liability without using ODT's proprietary OFAST software.

[*Id.*, pp. 181-82].

<u>Law and Analysis</u>

At issue here is whether, under 11 U.S.C. §505, ODT's Claim for unpaid use taxes should be disallowed, disallowed in part, or allowed in full.

Ordinarily, bankruptcy courts tasked with allowing/disallowing claims against the estate utilize a claims process-specific burden-shifting framework. *See*, *Morton v. Morton* (*In re Morton*), 298 B.R. 301, 307 (6th Cir. BAP 2003). However, because "state law governs the substance of claims" and "the burden of proof [is a] substantive aspect of a claim," a bankruptcy court tasked with determining the validity and amount of a state tax claim under §505 must utilize the same burden-shifting framework provided for under state law. *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20-21, 120 S.Ct. 1951, 1955, 147 L.Ed.2d 13 (2000)(citations and quotation omitted). Thus, this court will look to Ohio tax law in deciding whether Trustee's Objection has merit. *See e.g.*, *In re Healthco Intern., Inc.*, 257 B.R. 379 (Bankr. D. Mass. 2001)(analyzing an objection to a Massachusetts tax claim under Massachusetts' law pursuant to *Raleigh*).

The court construes the Trustee's Objection [Doc. #474] as directed at both ODT's tax assessment and the denial of claims of exemption from Ohio use tax.

Under Ohio law, "[t]he Tax Commissioner's findings are presumptively valid, absent a demonstration that those findings are clearly unreasonable or unlawful." *Kern v. Tracy*, 72 Ohio St.3d 347, 349, 650 N.E.2d 428, 429 (Ohio 1995)(quoting *Hatchadorian v. Lindley*, 21 Ohio St.3d 66, 488 N.E.2d 145, syllabus (Ohio 1986)); *Ball Corp. v. Limbach*, 62 Ohio St.3d 474, 584 N.E.2d 679 (Ohio 1992). In other words, "[w]hen an assessment is contested, the taxpayer has the burden to show in what manner and to what extent the commissioner's investigation and audit and the findings and assessments based thereon, were faulty and incorrect." *Kern*, 72 Ohio St.3d at 349, 650 N.E.2d at 429 (quoting *Federated Dept. Stores, Inc. v. Lindley*, 5 Ohio St.3d 213, 215, 450 N.E.2d 687, 688 (Ohio 1983)).

Pursuant to O.R.C. §§5739.02 and 5741.02(G), "every sale or use of tangible personal property is presumed to be taxable." *East Mfg. Corp. v. Testa*, 154 Ohio St.3d 200, 203, 113 N.E.3d 474, 477 (Ohio 2018). Accordingly, the party seeking an exemption from tax "bears the burden of affirmatively establishing his right thereto…" and statutes that provide for exemption from taxation are strictly construed in favor of taxation. *Ford Motor Co. v. Limbach*, 32 Ohio St.3d 136, 137, 512 N.E.2d 658, 659 (Ohio 1989)(citations omitted); *Ball Corp,* 62 Ohio St.3d at 479,

23

584 N.E.2d at 683.

Due to the structure of Ohio's tax appeal system, Ohio courts typically review tax assessments on appeal from the Ohio Board of Tax Appeals ("BTA"). *See e.g.*, *HealthSouth Corp. v. Testa*, 132 Ohio St.3d 55, 969 N.E.2d 232 (Ohio 2012); *Kern*, 72 Ohio St.3d 347, 650 N.E.2d 428. In this case, however, ACI filed for bankruptcy before it could appeal ODT's tax assessment using the BTA process. Thus, there is no prior BTA decision for this court to review, and while it will still give proper deference to ODT's assessment as provided for under Ohio law, *see*, *Kern*, 72 Ohio St.3d at 349, 650 N.E.2d at 429, the court must weigh the evidence presented at trial in determining the validity and extent of the tax claim at issue.[17] *Cf. HealthSouth Corp.*, 132 Ohio St.3d at 57, 969 N.E.2d at 235 ("The function of weighing evidence and determining credibility belongs to the BTA…").

## I.     Use Tax on Expenses and Purchases, and the Manufacturing Exemption

The Trustee objects to ODT's assessment of use tax on certain expenses incurred and purchases made by AED, arguing that Ohio's Manufacturing Exemption shields those expenses and purchases from assessment of the use tax. [Doc. #587, p. 7].

Ohio Revised Code §5739.02(B)(42)(g),[18] in concert with §5741.02(C)(2), exempts from taxation the sale, storage, use, or consumption of tangible personal property or services (otherwise referred to as the "thing transferred[19]") where the purpose of the taxpayer is to use the thing

---

17/  ODT cites to *The Buckle, Inc. v. Testa*, Ohio B.T.A. No. 2017-1826, 2018 WL 2017025, at *2, 2018 Ohio Tax LEXIS 932 at *4 (April 23, 2018) for the proposition that neither the BTA nor this court should reweigh evidence or require that ODT submit evidence "to demonstrate the propriety of the commissioner's findings which are presumptively correct." In *The Buckle, Inc.*, however, the appellant taxpayer did not request an evidentiary hearing and did not submit *any* evidence in support of its notice of appeal. *Id.* at *1. Accordingly, the *Buckle* BTA panel had only the taxpayer's notice of appeal, ODT's assessment transcript, and ODT's legal brief before it, noting that "…the overall credibility of appellant's position cannot be effectively judged" as it found in favor of ODT. *Id.*

Unlike *The Buckle, Inc.*, the Trustee in this case has submitted a great deal of evidence in support of its Objection, and an evidentiary hearing was held at which ODT was given ample opportunity to impeach and/or rebut that evidence. Thus, while the court recognizes that ODT's tax assessment is presumptively valid and that the Trustee bears the burden of proof in these §505 proceedings, the court will nevertheless weigh the evidence presented in the first instance in determining whether Trustee's Objection has merit.

18/  Ohio's "Manufacturing Exemption" currently codified under §5739.02(B)(42)(g) was previously codified at O.R.C. §5739.01(E)(2), (E)(9), and (E)(10). *See*, *Sims Bros. v. Tracy*, 83 Ohio St.3d 162, 164, 699 N.E.2d 50, 53 (Ohio 1998)(analyzing Manufacturing Exemption claims under §5739.01(E)(2), (E)(9), and (E)(10)); *Southwestern Portland Cement Co. v. Limbach*, 35 Ohio St.3d 196, 519 N.E.2d 831 (Ohio 1988)(analyzing Manufacturing Exemption claims under §5739.01(E)(2)).

19/  Repairs and fuel utilized by or in service of a particular "thing transferred" are also exempted from use tax if the "thing transferred" is itself exempt. *See*, O.R.C. §5739.011(B)(11); Ohio Adm. Code 5703-9-21(C)(5).

24

transferred "primarily in a manufacturing operation to produce tangible personal property for sale."

A "manufacturing operation" is defined as:

> …a process in which materials are changed, converted, or transformed into a different state or form from which they previously existed and includes refining materials, assembling parts, and preparing raw materials and parts by mixing, measuring, blending, or otherwise committing such materials or parts to the manufacturing process. "Manufacturing operation" does not include packaging.

O.R.C. §5739.01(S).   The list of activities that constitute "manufacturing operations" in §5739.01(S) is non-exhaustive and "merely illustrates types of actions that constitute a manufacturing operation." *Lafarge North America, Inc. v. Testa*, 153 Ohio St.3d 245, 248, 104 N.E.3d 739, 742 (Ohio 2018).

The Ohio Administrative Code provides further guidance that focuses on the "point of commitment," stating that:

> The manufacturing operation begins when the raw materials or parts are committed to the manufacturing process.  If the raw materials or parts are stored after being received at the manufacturing facility, the raw materials or parts are not committed until after they are removed from such initial storage. The point of commitment is where the materials handling from such initial storage has ceased or the point where the materials or parts have been mixed, measured, blended, heated, cleaned, or otherwise treated or prepared for the manufacturing process, whichever first occurs. If the raw materials or parts are not stored, they are committed at the point where materials handling from the place of receipt ceases or where they are mixed, measured, blended, heated, cleaned, or otherwise treated or prepared for the manufacturing process, whichever first occurs. The commitment of the materials or parts need not be irrevocable, but they must have reached the point, after materials handling from initial storage has ceased, where they normally will be utilized within a short period of time. The point of commitment frequently will be different for particular materials and parts, since they are introduced at different times in the manufacturing operation.

Ohio Adm. Code 5703-9-21(B)(1); *see also*, *Sims Bros.*, 83 Ohio St.3d at 165, 699 N.E.2d at 53 (holding that the Manufacturing Exemption only applies at the point in the process where the property's "constituent materials are changed in such a manner that their original form is altered, such as when a liquid and a solid are mixed to create a solution.").

Section 5739.011(D) provides that "if the 'thing transferred' is a machine used by a manufacturer in both a taxable and an exempt manner, it shall be totally taxable or totally exempt from taxation based upon its quantified primary use."   Thus, the court must look to the "quantified primary use" of the pieces of equipment at issue in deciding whether the Trustee has established

that the Manufacturing Exemption applies.   In doing so, the court looks not only to the amount of time equipment was used for a particular purpose, but also to "the value of its contribution to the product which is processed." *Manfredi Motor Transit Co. v. Limbach*, 51 Ohio St.3d 155, 156-57, 555 N.E.2d 286, 288 (Ohio 1990)(citation omitted).

The Ohio Supreme Court has applied and analyzed Ohio's Manufacturing Exemption on a number of occasions,[20] and two of those cases, *Lafarge*[21] and *Sims Bros.*, closely track with the issues before this court.   In *Lafarge*, the challenging taxpayer was in the business of producing pelletized slag, a process that involved breaking off pieces of slag from a nearby "slag mountain" and turning the pieces into salable pellets. 153 Ohio St.3d at 246, 104 N.E.3d at 741.   As it overturned the BTA's finding that the pieces of equipment used to break pieces of slag off of the "slag mountain" were not exempt, the *Lafarge* court held that "the act of cutting slag from the mountain commits the material to the manufacturing process…" and that "the manufacturing operation continues [from that point on] until Lafarge has completed its manufacture of pelletized slag." *Id.* at 250, 104 N.E.3d at 744 (quotation omitted).

Both parties offer different interpretations of the Supreme Court of Ohio's decision in *Sims Bros.* and the court finds the Trustee's position to be more compelling.   In *Sims Bros*, the court found against a taxpayer that had challenged ODT's use tax assessments on various cranes used in the taxpayer's scrapping operations. 83 Ohio St.3d at 166, 699 N.E.2d at 53-54.   The *Sims Bros.* court held that, because "the scrap metal could have been retrieved and resorted at any point prior…" to baling and shearing, "use of the cranes to sort and load materials into [baling and shearing] machines does not qualify for exemption." *Id.*, 699 N.E.2d at 54.

Notably, the taxpayer in *Sims Bros.* was in the business of recycling scrap metals, but it did not do any dismantling work of its own, instead receiving its scrap from other sources, like car and dishwasher manufacturers.[22] *Id.* at 162-63, 699 N.E.2d at 51 (syllabus).   Here, however, AED

---

20/   *General Motors Corp., Chevrolet Div. v. Limbach*, 47 Ohio St.3d 72, 547 N.E.2d 1167 (Ohio 1989); *Southwestern Portland Cement Co. v. Limbach*, 35 Ohio St.3d 196, 519 N.E.2d 831 (Ohio 1988); *Lafarge North America, Inc.*, 153 Ohio St.3d 245, 104 N.E.3d 739; *Sims Bros.*, 83 Ohio St.3d 162, 699 N.E.2d 50.

21/   The court notes that, because it was decided long after she performed the audit, Ms. Wash did not have *Lafarge* – or training based on its analysis – available to her in making her audit decisions.   Similarly, Mr. Thomas prepared his report [Ex. T] before the *Lafarge* decision was issued.

22/   The taxpayer in *Warren Scrap Co.*, an unreported Ohio Court of Appeals case relied on by ODT, performed scrap work that appears very similar to that of the taxpayer in *Sims Bros. Compare*, *Warren Scrap Co.*, 1988 WL 32964 at *1, 1988 Ohio App. LEXIS 820 at **1-2 (Ohio Ct. App. March 11, 1988) *with*, *Sims Bros.*, 83 Ohio St.3d at

performed scrapping work as a component of a larger process that can include onsite scrap processing and the deconstruction of entire buildings [Doc. #582, p. 92; Doc. #561-2, pp. 2-3], the latter of which only occurred outside of Ohio during the audit period. [Doc. #582, pp. 30, 92]. Thus, while the taxpayer in *Sims Bros.* did work similar to that of AED, the court finds that AED nevertheless performed scrapping work that differs sufficiently to warrant a different manufacturing exemption analysis.[23]

Unlike the taxpayers in both *Lafarge* and *Sims Bros.*, both of which adhered to a more straightforward manufacturing process, AED/Gator's process was more variable and appeared to change based on the nature of the scrapping task at hand. [Doc. #582, p. 96]. In *Sims Bros.*, the taxpayer's manufacturing process, as the Supreme Court of Ohio described it, revolved around the use of its baling and shearing machines such that only the use of those machines, not the use of the cranes then at issue, constituted a manufacturing process. 83 Ohio St.3d at 166, 699 N.E.2d at 54. Similarly, the taxpayer in *Lafarge* engaged in a single process: breaking off pieces of slag, crushing it, and then screening and sorting the processed slag before sale. 153 Ohio St.3d at 246, 104 N.E.3d at 741.

Here, as Mr. Ramun credibly testified, what was done at the Youngstown yard depended on the kind of material being worked on. [Doc. #582, pp. 27-28, 54, 62-63, 96]. Additionally, AED/Gator's process appears to have been more comprehensive than that of the taxpayers in *Lafarge* and *Sims Bros.* Not only did AED/Gator prepare scrap with the grade and composition of the end product in mind [*Id.*, pp. 62-63, 95-97], the record reflects that AED processed scrap containing a wide variety of materials – including magnets, wire, brass, cast iron, and steel – many of which required specialized handling and preparation. [*Id.*, pp. 27-28, 36, 96]. Gator also manufactured its own brand of scrap processing attachments [*Id.*, pp. 27-28, 139], a process that

---

162-63, 699 N.E.2d at 51-52. Thus, the court finds that *Warren Scrap Co.*'s application to the case at hand is limited for reasons similar to those underlying this court's analysis of *Sims Bros.*

23/ The court notes that, unlike the more recent *Lafarge* opinion, *Sims Bros.* was not a unanimous decision. In a short, yet persuasive dissent, Justice Pfeifer explained that he would have held that the cranes at issue qualified for the manufacturing exemption because "[t]he cranes used by Sims Bros. to sort and mix scrap metal are an integral part of Sims's manufacturing operation…" and "the work the cranes do commits the metal to the manufacturing process." 83 Ohio St.3d at 167, 699 N.E.2d at 55 (J. Pfeifer, dissenting).

Additionally, although ODT's briefing in *Lafarge* cited *Sims Bros.* (and its underlying BTA decision) at least twelve times, in rejecting ODT's position, the Ohio Supreme Court's unanimous decision in *Lafarge* never cited to *Sims Bros. See*, Merit Brief of Appellee, *Lafarge*, 153 Ohio St.3d 245, 104 N.E.2d 739.

itself qualifies as a manufacturing operation under O.R.C. §5739.01(S) such that equipment used to produce Gator attachments would also be exempt from Ohio use tax.

In applying *Lafarge* and *Sims Bros.* to the case at hand, the court finds that most of the equipment used by AED at the Youngstown facility, including Gator-made attachments and the equipment used to produce them, qualifies for the Manufacturing Exemption provided for under Ohio law. However, given the presumptive validity of ODT's audit, the court finds that only equipment that has been linked with a produced invoice can be held exempt.

Unlike the taxpayer in *Sims Bros.*, AED/Gator utilized a diverse, multi-step manufacturing process[24] that involved more than merely receiving scrap from third-party sources and processing it via shearing and baling. Instead, in a manner somewhat more akin to the taxpayer's breaking off of slag pieces in *Lafarge*, AED/Gator essentially produced its own scrap via its offsite dismantling and scrapyard work,[25] with various excavators, forklifts, and other pieces of equipment, some with Gator-made attachments, turning larger, unsalable pieces of scrap into smaller, marketable items at the Youngstown facility. [Doc. #582, pp. 36, 92].

Mr. Ramun credibly testified that most of the equipment at issue was primarily used in scrap processing or manufacturing Gator attachments [Doc. #582, p. 38], which satisfies O.R.C. §5739.011(D)'s proportional use requirement. *See*, *Manfredi Motor Transit Co.*, 51 Ohio St.3d at 156-57, 555 N.E.2d at 288. However, because Mr. Ramun testified that the rock trucks were

---

24/  ODT cites to *Portland Cement Co.*, 67 Ohio St.2d 417, 419, 424 N.E.2d 304, 306 and argues that, because Ohio has rejected the "integrated plant" theory with regards to manufacturing, the court should find against AED because AED focuses too much on characterizing its "operations" instead of the specific equipment at issue. However, ODT's argument overlooks the extent to which Mr. Ramun provided specific, credible testimony, complete with reference to documentary evidence, in support of the Trustee's characterization of the equipment at issue. Thus, because AED is offering a theory of manufacturing that specifically addresses most of the equipment at issue, the court finds that *Portland Cement Co.* is largely inapplicable here.

Additionally, the holding in *Lafarge* makes clear that, to answer questions regarding when materials are changed in form and committed to the manufacturing process, "it is important to understand…the object of [the taxpayer's] manufacturing operation….." 153 Ohio St.3d at 249, 104 N.E.3d at 744. Accordingly, it is appropriate for this court to look to the object of AED's operations, be it dismantling, scrap processing, or some mix of the two, in determining when and where Ohio's Manufacturing Exemption applies.

25/  ODT takes issue with the Trustee's characterization of AED's business, arguing that AED cannot be both a dismantling and scrap processing operation at the same time for purposes of contrast with *Sims Bros.* and *Warren Scrap*. However, the extent to which AED's operations differ from those of the taxpayers in *Sims Bros.* and *Warren Scrap*, particularly with respect to the wider scope of its work, goes to the heart of why those cases do not align with the one before this court. The court sees no reason why AED cannot be in the business of performing both dismantling and scrap processing work, the Trustee's emphasis on one or the other notwithstanding.

28

primarily used to load and unload scrap [Doc. #582, p. 46], the court finds that AED has failed to rebut the presumptive validity accorded the tax audit's finding that the rock trucks were taxable. *See*, *Kern*, 72 Ohio St.3d at 349, 650 N.E.2d at 429. Thus, expenses related to rock trucks as evidenced by Exhibits B-29, B-35, E-3, I-7, I-9, and I-12 are subject to Ohio use tax.

The court's finding that ODT relied on erroneous information in its use tax assessment is supported by the fact that Ms. Wash's testimony reflected that she did not have an accurate understanding of the work that AED did at the Lorain jobsite.[26] Ms. Wash testified that, per her understanding, dismantling work was being done in Lorain and that numerous pieces of equipment were thus located at the Lorain jobsite (and found taxable) by virtue of their being involved in dismantling work. [Doc. #583, pp. 126-27, 147]. However, the evidence presented by the Trustee, particularly Mr. Ramun's testimony with reference to the Exhibit U equipment list and the work invoices that were consistent with that testimony, reliably established that no dismantling work was being done in Lorain (or in Ohio at all) and that no listed dismantling equipment was located there. [Doc. #582, pp. 27-28, 30; Ex. 28]. The court notes that the Trustee's expert, Mr. Thomas, had a similarly flawed understanding of what went on at the Lorain jobsite [Doc. #582, p. 224] and the court will accordingly give less weight to his testimony.

For purposes of determining the "point of commitment," the court finds that it occurs either when AED begins dismantling a structure offsite or when semi-broken down materials are first processed at the Youngstown facility. In both cases, the materials are committed to the manufacturing process when they are first broken down, be it into larger semi-processed pieces of scrap or into constituent materials ready for further sorting and grading, because they are "…transformed into a different state or form from which they previously existed…" by virtue of being deconstructed. *See*, O.R.C. §5739.01(S).

Even if AED's scrapping process was at times reversible, which seems unlikely based on the record before the court, the Ohio Administrative Code makes clear that "[t]he commitment of the materials or parts need not be irrevocable[27]…" and that the focus is on when materials leave

---

26/ The root of the problem appears to be that AED's accountants did not have complete information about AED's operations. The work at the Lorain site – processing rejected pipe – was very different than the dismantling and scrapping activities performed by AED.

27/ The court notes that Ohio Adm. Code 5703-9-21(B)(1) appears at odds with the holding in *Sims Bros. Compare*, Ohio Adm. Code 5703-9-21(B)(1)(" "[t]he commitment of the materials or parts need not be irrevocable…" *with*, *Sims Bros.*, 83 Ohio St.3d at 166, 699 N.E.2d at 54 ("…Sims's use of cranes to load and unload its baling and shearing machines does not involve such a change, conversion, or transformation…. Rather the record supports the conclusion

initial storage or "where they are mixed, measured, blended, heated, cleaned, or otherwise treated or *prepared for the manufacturing process*, whichever first occurs." Ohio Adm. Code 5703-9-21(B)(1) (emphasis added). Here, the evidence presented establishes that, once a structure is dismantled offsite or AED begins work on a semi-broken down piece of scrap at its Youngstown facility, the materials are prepared for and committed to AED's manufacturing process, a process that continues until the scrap is transformed into a marketable, finished product. [Doc. #582, pp. 36, 92].

Under O.R.C. §5739.011(B)(11), repairs on, and fuel used by, equipment found exempt from use tax under the Manufacturing Exemption are also exempt. Thus, the court finds that, where a piece of AED/Gator equipment has been found exempt under O.R.C. §5739.02(B)(42)(g), repairs on and fuel used by said equipment are also exempt.

Overall, the court finds that Mr. Ramun testified credibly and with authoritative knowledge of the scrap business and AED/Gator's activities during the audit period. However, there were instances of his being unable to identify the contents of particular exhibits. Because Mr. Ramun's testimony is integral to whether the Trustee can meet his evidentiary burden in these §505 proceedings, where Mr. Ramun was not able to verify that the invoices in issue were for items that would be exempt from Ohio use tax, the audit findings will stand.

Consequently, the court finds that the Trustee has failed to meet his burden as to Exhibit W. Without specific documentary evidence to corroborate Mr. Ramun's testimony, the Trustee cannot show specifically and in detail the extent to which ODT's assessment was incorrect relative to the missing invoices listed on Exhibit W. *See*, *Kern*, 72 Ohio St.3d at 349, 650 N.E.2d at 429.

Moreover, the entire use tax audit process relies on businesses maintaining written records. To overturn audit findings where no documents have been produced would be contrary to the foundation the use tax assessment system is built upon. While there was testimony that certain exceptions can be granted relative to the strict rule requiring documentation, those are decisions that are made at the discretion of ODT, and this court will not impose those exceptions over ODT's objection. Thus, the court finds that ODT's use tax assessments on expenses evidenced by Exhibit W will stand.

---

that the scrap metal *could have been retrieved and resorted at any point* prior to actual operation of the bailing and shearing machines.")(emphasis added).

Additionally, ODT's use tax assessment on expenses evidenced by Exhibit K, expenses related to the purchase of personal radiation detector equipment, stands because O.R.C. §5739.011(C)(6) provides that "[t]angible personal property used for the protection and safety of workers" does not qualify as a "thing transferred" under O.R.C. §5739.02(B)(42)(g). Thus, the Trustee has failed to meet his burden with respect to Exhibit K and expenses evidenced by Exhibit K are taxable.

The Trustee has also failed to meet his burden with respect to the expenses evidenced by Exhibit P, expenses related to the disposal of waste materials generated by the Youngstown facility. Costs related to the disposal of waste materials do not appear to fall within the ambit of §5739.02(B)(42)(g) or §5741.02(C)(2) and the Trustee has made no additional showing that he is entitled to a related exemption. Thus, the $2,204.24 in expenses evidenced by Exhibit P are taxable.

To summarize, the court finds that the Trustee has met his burden as to the following expenses/asset purchases being exempt from Ohio use tax: $660.00 as evidenced by Exhibits A-1 through A-3; $26,014.00 as evidenced by Exhibits B-1 through B-4, B-6 through B-9, B-11 through B-26, B-28, and B-30 through B-33; $24,387.15 as evidenced by Exhibits C-1 through C-4, C-6, C-7, C-10, C-13 through C-19, and C-22 through C-24; $51,329.80 as evidenced by Exhibits D-1 through D-16; $3,090.00 as evidenced by Exhibit F; $91.98 as evidenced by Exhibit G; $1,597.05 as evidenced by Exhibit H; $8,125.00 as evidenced by Exhibits I-1 through I-5, I-8, I-11, and I-14 through I-19; $781.89 as evidenced by Exhibits J-1 through J-3; $51,329.80 as evidenced by Exhibits L-1 through L-35; $620.13 as evidenced by Exhibit M; $29.92 as evidenced by Exhibit N; $3,080.00 as evidenced by Exhibit O; $576.00 as evidenced by Exhibit Q; and $900,532.66 as evidenced by Exhibits R-1 through R-7.[28]   In total, the court finds that the Trustee has met his burden as to $1,072,245.38 in AED/Gator expenses/purchases being exempt under Ohio's Manufacturing Exemption.

## II.    Casual Sales

The Trustee also objects to ODT's assessment of use tax on sales that the Trustee alleges qualify as exempt under Ohio's "casual sales" exemption. [Doc. #587, p. 10].   Under Ohio law,

---

28/   Because the court finds that the expenses evidenced by Exhibits R-17 and R-19 qualify as "casual sales," the court declines to decide whether they also qualify as exempt under Ohio's Manufacturing Exemption.

16-40675-jpg    Doc 639    FILED 04/22/19    ENTERED 04/22/19 16:18:51    Page 31 of 35

sales of personal property or services by sellers that are not ordinarily in the business of selling said personal property or services may be exempt from use/sales tax assessment pursuant to a "casual sales" exemption. *See*, O.R.C. §5739.02(B)(8).   In the context of auctions, the "casual sale" exemption arises when the auctioneer sells goods at an auction that takes place at the original owner of the goods' place of business rather than at the auctioneer's place of business. *See*, O.R.C. §5739.01(L).[29]

The court finds that the Trustee has met his burden with respect to his "casual sales" challenge because he presented credible, unrebutted testimony from Mr. Ramun that identified the auction purchase invoices and where each auction purchase took place. [Doc. #582, pp. 70-79; Doc. #583, pp. 209-17].   In other words, the Trustee offered specific and credible testimonial evidence [*Id.*], complete with reference to exhibits [Exs. R-8 through R-13, R-17, R-19], showing that the auction purchases at issue were made on the owner's site, not the auctioneer's business property. *See*, O.R.C. §5739.01(L).   Thus, the $886,924.10 in auction purchases as evidenced by Exhibits R-8 through R-13, R-17, and R-19 are exempt as "casual sales" and not subject to Ohio use tax.

### III.    Janitorial Expense Calculation

Lastly, the Trustee argues that ODT impermissibly relied on a flawed calculation method that overstates the amount AED spent on janitorial services during the taxation period at issue. [Doc. #587, p. 10].   Specifically, the Trustee alleges that ODT's representative sampling method upwardly skewed its use tax assessment on janitorial services because the sample account included general contracting expenses that were unrelated to janitorial service expenses. [*Id.*].   Because general contracting expenses were unusually low during the sample year, the Trustee argues, the resulting 90% proportion of janitorial services (taxable) to general contracting (not taxable) applied to the sample account produced an erroneously high extrapolated use tax liability. [*Id.*; Doc. #588, p. 18].   Instead of the $1,391,889.40 in audit period janitorial service expenses as estimated by ODT's sample year calculation, it is the Trustee's position that AED only spent

---

29/  O.R.C. §5739.01(L) states in full:
    "Casual sale" means a sale of an item of tangible personal property that was obtained by the person making the sale, through purchase or otherwise, for the person's own use and was previously subject to any state's taxing jurisdiction on its sale or use, and includes such items acquired for the seller's use that are sold by an auctioneer employed directly by the person for such purpose, provided the location of such sales is not the auctioneer's permanent place of business. As used in this division, "permanent place of business" includes any location where such auctioneer has conducted more than two auctions during the year.

$371,051.00 on taxable janitorial services during the audit period. [Doc. #587, p. 10].

Under Ohio law, ODT is permitted to use a sample to avoid having to conduct a complete audit of a taxpayer's use and/or sales. *See*, *Beck v. Zaino*, Case No. 2003-M-1257, 2004 WL 1906926 at *5, 2004 Ohio Tax LEXIS 1277 at *12 (Ohio B.T.A. August 20, 2004)(citing *Akron Home Medical Servs., Inc. v. Lindley*, 25 Ohio St.3d 107, 495 N.E.2d 417 (Ohio 1986)). "The use of a sample does not, however, permit the Tax Commissioner to ignore actual records in existence during the audit period." *Id.*, 2004 Ohio Tax LEXIS 1277 at **12-13 (citing *Shaks-Korner, Inc. v. Zaino*, Case No. 1999-M-1442, 2001 WL 1029581 (Ohio B.T.A. September 7, 2001)).

Much like the rest of ODT's findings, an assessment based on a representative sampling audit is presumed correct and the objecting taxpayer bears the burden of "prov[ing] in what manner and to what extent the commissioner's investigation and accompanying audit, and the findings and corresponding assessments based thereon, were in error." *Id.* at *10 (citing *Federated Dep't Stores, Inc. v. Lindley*, 5 Ohio St.3d 213, 450 N.E.2d 687 (Ohio 1983)). Ultimately, "…the burden of proof remains solely on the taxpayer to demonstrate that the period [or sample] chosen is not representative." *Aguilar v. Zaino*, Case No. 2002-A-1241, 2003 WL 21291894 at *3, 2003 Ohio Tax LEXIS 773 at *7 (Ohio B.T.A. May 3, 2003)(citing *Belgrade Gardens, Inc. v. Kosydar*, 38 Ohio St.2d 135, 311 N.E.2d 1 (1974); *Ohio Fast Freight v. Porterfield*, 29 Ohio St.2d 69, 278 N.E.2d 361 (1972)).

ODT cites to *Shugarman Surgical Supply, Inc. v. Zaino*, 97 Ohio St.3d 183, 777 N.E.2d 244 (Ohio 2002) and *Akron Home Med. Services, Inc. v. Lindley*, 25 Ohio St.3d 107, 495 N.E.2d 417 (Ohio 1986) for the proposition that AED cannot object to ODT's representative sampling method or its calculated error rate. However, the court finds that neither case precludes the Trustee's challenge here.

Unlike the Trustee here, the taxpayer in *Akron Home Med.* objected to the "test check" method used by ODT, an argument the Supreme Court of Ohio found unavailing because the taxpayer had previously entered into a binding written agreement that set forth ODT's "test check" assessment methodology. 25 Ohio St.3d at 110, 495 N.E.2d at 421-22. In other words, the *Akron Home Med.* taxpayer did not attempt to show specifically how ODT's figures were wrong, instead opting to argue (unpersuasively) that it had rescinded the agreement and that the methodology used was thus not agreed upon. *Id.*; *accord*, *R & K Entm't v. Zaino*, Case No. 2004-B-103, 2004 WL

33

1631689 at *5, 2004 Ohio Tax LEXIS 1068 at *12 (Ohio B.T.A. July 16, 2004)(finding against a taxpayer that challenged ODT's representative sample methodology instead of "…submitt[ing] any such evidence quantifying the errors claimed or demonstrating its actual tax liability.").

Similarly, in *Shugarman*, the Supreme Court of Ohio found against a taxpayer that had challenged both ODT's use of a sampling method and the resulting error rate, holding that the pre-audit agreement between the taxpayer and ODT was a waiver of the taxpayer's objection to the sampling period and error rate used. 97 Ohio St.3d at 186, 777 N.E.2d at 248. However, the *Shugarman* court also entertained the taxpayer's argument that the actual sales tax calculation was incorrect. *Id.* Nevertheless, the *Shugarman* court found that the taxpayer had "failed to produce any evidence to show that the figures used by the commissioner erroneously included" the allegedly improper sales numbers. *Id.*

Here, the Trustee has produced the evidence that the *Shugarman* court found wanting, convincingly showing the extent of ODT's use tax assessment error with regards to janitorial services. The Trustee produced exhibits and testimony that persuasively show that use of a sample account that lumped janitorial service expenses with general contracting expenses[30] produced an erroneous and significantly overstated use tax figure of $1,391,889.40. [Doc. #582, pp. 152-53; Doc. #583, pp. 43-44; Exs. S-1 through S-7]. Instead, the court finds that AED/Gator only owes use tax on $371,051.00, an amount the Trustee has established as the actual janitorial expenses AED/Gator incurred during the audit period. [*Id.*].

Thus, the court finds that the Trustee has met his burden with regards to use tax assessed on janitorial services and will adjust ODT's claim downward, with AED/Gator only owing use tax on $371,051.00 in actual janitorial expenses.

## Conclusion

First, the Trustee has met his burden as to proving that $1,072,245.38 in AED/Gator expenses and purchases, as represented by their corresponding invoices, are exempt from Ohio use tax pursuant to §5739.02(B)(42)(g). Second, the Trustee has made a sufficient showing to prove that $886,924.10 in auction purchases, as evidenced by Exhibits R-8 through R-13, R-17, and R-19, qualify as "casual sales" under Ohio law and are thus exempt from Ohio use tax. Third, the Trustee has established that the use tax ODT assessed on janitorial services was overstated and

---

30/ There was no evidence presented indicating that this was anything other than a harmless accounting practice had there been no audit.

that, instead of owing use tax on an estimated expense figure of $1,391,889.40, AED/Gator only owes use tax on $371,051.00. Fourth, all of ODT's use tax audit findings not addressed above will stand.

Because the court has not calculated AED's final use tax liability,[31] this opinion is not intended to constitute a final judgment. Instead, this court will issue a final judgment consistent with this opinion once the parties have calculated a use tax figure, plus statutory penalties and interest, using the above findings.

**THEREFORE**, good cause appearing,

**IT IS ORDERED** that the Trustee's Amended Objection to Claim No. 8 [Doc. #474] be, and hereby is, **ALLOWED IN PART AND DISALLOWED IN PART** consistent with the above findings.

**IT IS FURTHER ORDERED** that a joint telephonic status conference be set for May 6, 2019 at 10:00 a.m. so that the parties can establish a timeline, and method, for calculating AED/Gator's adjusted use tax liability. The parties should provide chambers with a contact telephone number at least 24 hours prior to the hearing.

**IT IS FURTHER ORDERED** that any participation in the calculation of a final dollar figure for ODT's use tax claim based on the above Memorandum Opinion and Order shall not constitute a waiver of the right to raise any issue on appeal, including the accuracy of the calculation(s).

---

31/ It was established at trial that the court would be unable to accurately calculate the final use tax obligation. The calculation is technical and almost always done using the proprietary OFAST software. The court does not have access to the OFAST software.